Ryan Darden was convicted of three counts of first degree burglary, three counts of first degree robbery, and two counts of first degree rape. He was sentenced, on the burglary convictions, to terms of imprisonment for 25, 25, and 30 years; on the robbery convictions, to 30, 30, and 50 years; and on the rape convictions, to two 99-year terms. On this appeal from those convictions, he raises one issue.
The defendant claims that he was arrested without probable cause. Thus, he argues that the trial court erred by denying his motion to suppress his fingerprints, photographs, and confession as the fruits of an unlawful arrest.
In 1988, Birmingham Police Sgt. Carl M. Quinn was investigating a series of burglaries, robberies, and rapes which had occurred from the spring of 1986 to the summer of 1988 in the Woodlawn-Crestwood area of the city. Since latent fingerprints lifted at the scene in seven of the cases matched each other, Quinn suspected that the same person committed all the offenses. In addition, the victims were all elderly, lived in close proximity to each other, and gave similar descriptions of their assailants.
The defendant was arrested for these offenses on July 13, 1988. At the hearing on the motion to suppress, Sgt. Quinn testified to the information that he had had, prior to that date, regarding the defendant's involvement in the offenses. The defendant did not testify at the hearing.
Sgt. Quinn asked Birmingham patrolman Harold Benson to locate the defendant so that he, Quinn, could talk to him. Quinn gave Benson a photocopy of the defendant's driver's license.
On July 13, 1988, Benson saw a young black male, who appeared to be the same person depicted on the driver's license, sitting near the curb in front of a vacant house. Benson motioned to the youth, requested that he come over to the patrol car, and asked his name. The defendant replied *Page 1274 
that he was Ryan Darden and acknowledged that he was the person pictured on the photocopied driver's license. Benson told the defendant that Sgt. Quinn wanted to speak to him, and the defendant asked whether it was "about the attacks on the old women." Benson said that he "wasn't really positive" and asked the defendant if he would come down to the precinct. The defendant agreed.
Benson radioed for another police car "with a shield." When that car arrived, the defendant "got in" the car and Benson handcuffed him. Benson told the defendant that he was "required to handcuff him to take him to the precinct." On cross-examination of Officer Benson, the following occurred:
 "Q. [By defense counsel] When he got into your car Ryan Darden was not free to leave, was he?
"A. When he got into my car?
 "Q. Yeah, when you told him to get into your car.
"A. At that particular time, no, sir.
 "Q. Okay. And when you handcuffed him and put him in the other car he was not free to leave?
"A. He couldn't leave then, no, sir.
 "Q. And . . . the purpose of handcuffs [is] to restrain one's movement, isn't it?
"A. Yes, sir, it is.
 "Q. And to keep one there, isn't it? He was in fact, regardless of the words, arrested by you, wasn't he?
"A. No, sir.
 "MR. McGREGOR [assistant district attorney]: Judge, for the purpose of the hearing we will stipulate for the purposes of this trial that he was in fact, quote, in custody at that point as far as the legal term is concerned. There may be some argument as to whether he was still, quote, in custody later on at the station. But for this particular point from the time he was placed in the patrol car and had the handcuffs put on him he was in custody. We have no argument with that."
When the defendant arrived at the East Lake precinct, he was taken to Sgt. Quinn's office. The record does not indicate exactly when the handcuffs were removed, but by the time Sgt. Quinn entered the office the defendant was not handcuffed. Quinn told the defendant he wanted to talk to him about the Crestwood burglary cases. He stated that the only way he could eliminate the defendant as a suspect was to take his fingerprints and compare them to prints found at the crime scenes. Quinn asked the defendant if he would agree to be fingerprinted, and the defendant said "yes." Quinn also inquired whether the defendant "minded" being photographed. The defendant stated that he did not mind. The defendant was then photographed and fingerprinted.
Sgt. Quinn told the defendant that he would have the fingerprints checked. Then he offered to take the defendant home or to work or wherever he wanted to go. The defendant asked to be taken to work. The two got into Quinn's car, with the defendant uncuffed and seated in the right passenger seat of the vehicle, and they left the precinct. The defendant asked Quinn to take him to NBC Bank downtown to talk to his mother. Quinn drove to the bank. He testified that he, Quinn, "wanted to stay in the car, but [the defendant] asked [Quinn to] . . . go in and talk to her [the defendant's mother]." Quinn told the defendant that he "didn't think it was necessary," but the defendant insisted and Quinn accompanied the defendant into the bank.
Sgt. Quinn talked to the defendant's mother, who seemed "anxious" and "upset" that her son had been questioned and fingerprinted. Sgt. Quinn assured her that if the fingerprints "came back negative," he would return them to her so there would be no record of her son's prints "in any official capacity." The defendant's mother told Quinn that she wanted the prints before she left work at 5:00 p.m. that day. Quinn agreed and he told her that he would take the defendant home.
As they left the bank, Quinn informed the defendant that he was going to drop off the prints at the identification section downtown so that he would be able to meet the 5:00 deadline set by the defendant's *Page 1275 
mother. While Quinn went into the I.D. section building, he left the defendant, uncuffed and alone, in the unlocked car. Quinn gave the defendant's prints to examiner Sandy Triplett. Triplett looked at the prints and asked Quinn to wait a few minutes. Then Quinn went back to the car and told the defendant they were going to wait there for a while. The defendant was reading a magazine and he said "okay." In a few minutes, Sandy Triplett came out, waved Sgt. Quinn over, and told him that she had matched the defendant's prints to some of the latent prints left at the Crestwood burglary crime scenes.
Quinn returned to the car and told the defendant that they were "going to have to talk about this further . . . at [Quinn's] office at city hall." The defendant replied, "all right." They drove to City Hall, where Quinn escorted the defendant to a large conference room and left him there alone. Shortly thereafter, Sgt. Quinn returned to the conference room with two other officers, told the defendant he was under arrest, and read him the Miranda rights. The defendant signed a waiver form; he later gave a full confession and accompanied the officers to each of the crime scenes.
As pointed out above, the State conceded that when the defendant was first handcuffed and taken to the East Lake precinct by patrolman Benson he was "in custody." The prosecutor argued that if there was an arrest, it was founded on probable cause based on the information known by Sgt. Quinn prior to the defendant's being picked up. The trial court ruled that the defendant's trip to the East Lake precinct "was a voluntary situation even though it was a custodial matter."
Although we acknowledge that the arrest issue is extremely close, we find that under the totality of the circumstances, the defendant was not under arrest when he was handcuffed and transported to the East Lake precinct. We also find, however, that even if an arrest took place when patrolman Benson handcuffed the defendant and took him to the precinct, there was probable cause at that time and the arrest was lawful.
 A. The Initial Encounter
In Bradley v. State, 494 So.2d 750 (Ala.Cr.App. 1985), affirmed, Ex parte Bradley, 494 So.2d 772 (Ala. 1986), cert. denied, 480 U.S. 923, 107 S.Ct. 1385, 94 L.Ed.2d 699 (1987), the accused was picked up for questioning by four law enforcement officers who arrived at his residence. The accused was frisked, "pushed down against the trunk of the car and handcuffed," placed in a patrol car, and transported to the police station. 494 So.2d at 755. He was not told why he was being picked up. Like patrolman Benson in the present case, the officers in Bradley testified that the accused was handcuffed "because it was the usual policy of the . . . Department to handcuff 'suspects being transported.' " 494 So.2d at 755. There is no indication that the officers told Bradley that, however.
This court observed:
 "The significance of what the officers actually told Bradley when they picked him up for questioning cannot be underestimated in determining whether or not an arrest actually occurred or whether Bradley consented and voluntarily agreed to accompany the officers."
Bradley v. State, 494 So.2d at 758. We noted that the State's evidence in Bradley was "inexplicably silent as to what actually occurred when Bradley was picked up. The State's evidence [did] not reflect any conversation between Bradley and the police at Bradley's residence." Id. at 755. Accordingly, we found the trial court's ruling that the accused "consented to being 'picked up for questioning' " erroneous in view of the "absence of any testimony from the police about what they told or asked Bradley during [the] confrontation and the nature of his response." 494 So.2d at 759-60.
In contrast, the defendant here was approached by a single officer on patrol who, without any strong-arm tactics, asked him to approach his patrol vehicle, told him that Sgt. Quinn wanted to talk with him, and inquired whether he would come down to *Page 1276 
the precinct. The State's evidence reflects that the defendant readily agreed, and the defendant did not take the stand at the hearing on the motion to suppress to refute this characterization of the conversation. Thus, the State's evidence here, unlike that in Bradley, was well-developed, undisputed, and indicative of a consensual encounter between Benson and the defendant.
Although Hayes v. Florida, 470 U.S. 811, 105 S.Ct. 1643,84 L.Ed.2d 705 (1985), "holds that probable cause is required for the 'involuntary removal of a suspect from his home to a police station and his detention there for investigative purposes, whether for interrogation or fingerprinting,' [470 U.S. at 815,105 S.Ct. at 1647], . . . Hayes does not change the rule that 'a voluntary trip to the police station for questioning does not implicate the Fourth Amendment.' United States v. Webster,750 F.2d 307, 321 (5th Cir. 1984), cert. denied, 471 U.S. 1106,105 S.Ct. 2340, 85 L.Ed.2d 855 (1985); Cox v. State,489 So.2d 612 (Ala.Cr.App. 1985)." Bradley v. State, 494 So.2d at 757.
"[I]n determining whether an individual has been seized or has voluntarily chosen to undergo police custody and interrogation, the totality of the circumstances must be considered." Id. at 758. Undoubtedly, the totality of the circumstances in the present case includes the significant fact that the defendant was handcuffed. As we observed in Bradley:
 "Generally and except in the most exceptional circumstances, a person must be considered under arrest once he has been handcuffed. People v. Calhoun, 73 A.D.2d 972, 424 N.Y.S.2d 247 (1980); People v. Galloway, 89 Misc.2d 435, 437, 391 N.Y.S.2d 798, 800 (Sup.Ct. 1977); Commonwealth v. Roscioli, 240 Pa. Super. 135, 137, 361 A.2d 834, 835
(1976). The handcuffing of an individual without explanation amounts to a show of official authority such that 'a reasonable person would have believed he was not free to leave.' United States v. Mendenhall, 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980)."
Bradley v. State, 494 So.2d at 759 (emphasis added). The emphasized portion of the foregoing quotation is critical here. This defendant was told why he was being handcuffed: Benson informed the defendant that he was "required" to handcuff him for transportation to the precinct. Without retreating from the observation we made in Bradley or approving the officer's stated reason here, it is evident that this defendant was not handcuffed "without explanation." Whether the explanation was true or false, meritorious or faulty, is beside the point. The fact that an explanation was given strengthens the conclusion that the handcuffing alone did not convert an otherwise consensual encounter into an arrest. The handcuffing is, instead, one factor among several to be considered in the voluntariness equation.
"Standard police policy" cannot suffice as a basis for handcuffing a suspect for whom there is no probable cause to arrest, see State v. Butler, 461 So.2d 922, 925
(Ala.Cr.App. 1984), and we do not condone the handcuffing here based on patrolman Benson's articulated reason. However, we do find that because a reason was given, the defendant was less likely to have viewed the action as coercive, singling him out among others, and was more likely to have considered it a matter of bureaucratic procedure to which all suspects were subjected.
Whether an arrest has occurred depends on "how a reasonable man in the suspect's position would have understood his situation." Berkemer v. McCarty, 468 U.S. 420, 442,104 S.Ct. 3138, 3151, 82 L.Ed.2d 317 (1984) (footnote omitted). In this regard, it is relevant to note defendant's response to Benson's request that he come down to the precinct: Defendant asked whether the inquiry would be "about the attacks on the old women." At the hearing on the motion to suppress, the State presented testimony that, prior to the defendant's arrest, dozens of young black males in the Woodlawn-Crestwood area had been picked up for questioning and later released. The "Crestwood rapist" cases had been highly publicized and the defendant, in fact, lived next-door to one of the victims. Under the *Page 1277 
circumstances, it is not unlikely that a reasonable person in the defendant's position would believe that he was one of many young black males being questioned and that he, like the others, would be free to go on his way after answering a few questions.
Although the fact that defendant was handcuffed is a weighty factor in the analysis of whether he was seized or voluntarily chose to undergo police custody, it diminishes in importance when viewed in light of later circumstances.
Those later circumstances include the following facts: the handcuffs were removed upon his arrival at the precinct; he was left unattended and unrestrained on four occasions, two of which presented good opportunities to leave or escape; Sgt. Quinn preceded every investigative action he took with a request or an inquiry whether the defendant "minded" submitting to the procedure; and Sgt. Quinn complied with the defendant's wishes regarding being taken home, to work, or to see his mother. Particularly significant in this regard are the visit to the bank, during which Quinn told the defendant it "wasn't necessary" for Quinn to accompany the defendant inside, and the stop at the fingerprint identification section, during which Quinn left the defendant totally unattended and unrestrained while he, Quinn, delivered the print cards to Sandy Triplett. Had the defendant felt restrained on either occasion, he could have gone into the bank alone or left the car. In either instance, he might have eluded Quinn altogether. While events at the precinct, the bank, and the unattended car cannot relate back to "cure" an earlier involuntary detention, they can shed light on what was likely to have been the perception of a reasonable person in the defendant's position from the beginning. When a suspect is handcuffed, questioned, photographed, and fingerprinted, there is always a potentially compelling environment. See Hayes v. Florida, supra. The potential may become a reality or it may never materialize, depending on the conduct of the police and the reaction of the suspect. See Bradley v. State, supra. Here, Sgt. Quinn's non-coercive treatment of the defendant, and the defendant's agreeable responses lead to the conclusion that the defendant probably understood his position to be that of a suspect voluntarily cooperating with, rather than submitting to the restraint of, the police.
We therefore find, in light of the totality of the circumstances, that the defendant's trip to the precinct was consensual and that his being photographed and fingerprinted was voluntary. Our holding is limited to the precise facts of this case and should not be construed to indicate our approval of handcuffing a suspect, pursuant to "standard police procedure," for whom probable cause to arrest does not exist.
 B. Probable Cause
Before patrolman Benson approached the defendant on July 13, 1988, Sgt. Quinn had the following information implicating the defendant in the "Crestwood rapist" cases:
1. Quinn had reason to believe that the assailant lived in the same area as his victims because the assailant always fled on foot and "seemed to disappear" around the railroad tracks which divide the north and south sides of the city. The defendant lived at 4719 Second Avenue North, near the railroad tracks. Using the middle of the tracks behind his house as the center of a circle, the homes of at least six victims in the "Crestwood rapist" cases were within a one-mile radius. One of the victims was the defendant's next-door neighbor.
2. The assailant left a red cap, bearing the insignia "NAGTFA Nationals" in the home of one of the victims. A photograph of the cap had appeared in The Birmingham News, along with the request that anyone having information about the cap contact law enforcement authorities. Michael DeWitt Thomas, track and field coach for the Birmingham Striders, called the police to report that the cap was identical to those given members of his track team when they attended a meet in Miami, Florida, in July 1985. He identified "NAGTFA" as "National Age Group Track and Field Association," and stated that every member of his team received such a *Page 1278 
cap that summer. The defendant was on this track team, attended the meet, and received a cap. There were 100 athletes from the Birmingham area who attended the meet; 80% were from Bessemer and 20% from Birmingham. Three of the team members were from the Woodlawn area of Birmingham: the defendant, B.F., and another person whose name Coach Thomas did not remember. The police "checked out" B.F. and found that when two of the crimes were committed, he was in the custody of the Department of Youth Services. On cross-examination at the suppression hearing, Coach Thomas acknowledged that there was a fourth Woodlawn athlete, H.J., whom he had forgotten to mention to the police. H.J. was not "checked out."
3. The assailant pointed to some photographs in the home of one of the victims and stated to the victim, "I went to school with your grandchildren. I graduated from Huffman last year." The defendant had graduated from Huffman High School the preceding year.
4. One of the crimes occurred near the Woodlawn gym on July 11, 1988. The assailant, wearing a Detroit Tigers baseball cap, took cash from an elderly couple. On July 11, 1988, Coach Thomas saw the defendant and some other youths playing basketball in the Woodlawn gym. Someone in the group was wearing a Detroit Tigers baseball cap. Thomas was not sure whether or not it was the defendant. He recalled that on that day or around that time, the defendant gave him $30 cash for the track team, stating that he had "collected it in the neighborhood," a fact Thomas found "unusual."
5. The defendant fit the physical description of the Crestwood rapist. The victims described their attacker as a young black male, 18 to 20 years of age or 16 to 25 years of age, good-looking, "not a street kid," built athletically, and muscular. Quinn knew that after graduation from Huffman High School, the defendant went to Alabama A M University in Huntsville, where he was a weight-lifter and a football player. Defendant's attending college in Huntsville accounted for the lapses in time between commission of the Crestwood crimes and explained their recurrence at times when a college student would have been home on vacation.
6. Coach Thomas looked at a group of composite pictures prepared at the direction of the crime victims by police department artists and picked out one that he said looked the most like the defendant. Thomas also told Sgt. Quinn that the defendant had "emotional problems."
7. In May of 1988, plainclothes Birmingham police officers Chuck Jordan and Don Reynolds approached the defendant in the Woodlawn area to question him and he ran from them. The defendant later told the police that he ran from the two white men in a predominantly black neighborhood because he thought they were homosexuals.
At the suppression hearing, the State argued that an additional piece of information incriminating the defendant, not known by Sgt. Quinn but gathered by patrolman Benson, was contained within the defendant's question to Benson, "Is this about the attacks on the old women?"
Under the circumstances, however, defendant's question added little or no weight to the probable cause equation. Given the notoriety of the "Crestwood rapist" cases, the fact that the defendant himself lived next to one of the victims, and the fact that numerous suspects in the defendant's age and racial group had already been questioned, his inquiry indicated a consciousness of guilt no more strongly than it reflected curiosity about a topic of current interest in the neighborhood.
Item 7, the fact that defendant ran from Officers Jordan and Reynolds, can also be largely eliminated as a factor contributing to probable cause. While some courts have held that flight at the approach of plain-clothes officers in an unmarked car is at most ambiguous, see United States v.Ortega-Serrano, 788 F.2d 299, 302 (5th Cir. 1986); United Statesv. Jones, 619 F.2d 494, 498 (5th Cir. 1980), others have concluded that the conduct is not, as a matter of law, suspicious, see People v. Huntsman, 152 Cal.App.3d 1073, 1091,200 Cal.Rptr. 89, 100-01 (1984). In view of the defendant's *Page 1279 
reasonable explanation for his flight and the fact that later,knowing patrolman Benson was a police officer, the defendant did not flee from him, little or no inference of defendant's guilt can be drawn here.
The remaining factors are significant and highly suggestive of the probability that the defendant was the Crestwood rapist. The most probative of all the information was supplied by Coach Thomas regarding the NAGTFA cap. The weakness of that information lay in the fact that while Thomas reported thatthree young men from the Woodlawn area received a cap like the one left by the assailant, he could provide the names of onlytwo of them and he later acknowledged that there was a fourth.
Even at the time defendant was picked up, the police knew that the suspect group contained one other person (the Woodlawn athlete whose name Coach Thomas could not remember), and evidence adduced at the suppression hearing shows, in hindsight, that the suspect group had yet another member, H.J. Does the fact that the suspect category had two members not eliminated by the police before they picked up the defendant mean that there was no probable cause to believe the defendant guilty? We think the answer to that question is "no."
With the information they were provided here, the police did narrow the suspect group. Given the two names of Woodlawn athletes which the police had, they eliminated one (B.F.) as a suspect before picking up the defendant. They also gathered other information about the defendant himself, such as his physique, residential proximity to the crime scenes, and school attendance, which pointed to his guilt. Compare Wong Sun v.United States, 371 U.S. 471, 481, 83 S.Ct. 407, 414,9 L.Ed.2d 441 (1963) (wherein the Court held that the arrest of Toy was unlawful because, although an informant had named one "Blackie Toy," the proprietor of a laundry on Leavenworth Street, as a drug dealer, there were several Chinese laundries on the street and more than one "Toy," and there was no showing that the police "had some information of some kind which narrowed the scope of their search to this particular 'Toy' ").
While the officers here might have asked Coach Thomas to search his records more thoroughly to locate the name of the third Woodlawn athlete that he initially could not recall, the concept of probable cause did not require that they do so, and it certainly did not require that they foresee the existence of a fourth athlete.
Probable cause "merely requires that the facts available tothe officer would 'warrant a man of reasonable caution in the belief,' " that an offense has been committed and that the accused committed it. Texas v. Brown, 460 U.S. 730, 742,103 S.Ct. 1535, 1543, 75 L.Ed.2d 502 (1983) (quoting Carroll v.United States, 267 U.S. 132, 162, 45 S.Ct. 280, 288,69 L.Ed 543 (1925)) (emphasis added). Probable cause "does not demand any showing that such a belief be correct or more likely true than false." Texas v. Brown, 460 U.S. at 742,103 S.Ct. at 1543. "[N]either certainty nor a 50% plus probability is demanded by the concept of probable cause." Mewbourn v. State,570 So.2d 805 (Ala.Cr.App. 1990) (when there is probable cause to believe contraband is in one of two places, it is proper to search both). See generally 1 W. LaFave, Search Seizure § 3.2(e) at 58694 (2d ed. 1987). LaFave observes:
 "If the function of arrest were merely to produce persons in court for purposes of their prosecution, then a more-probable-than-not test would have considerable appeal. But there is also an investigative function which is served by the making of arrests.[148] *Page 1280 
1 W. LaFave, § 3.2(e) at 591-92, n. 148.
Based on the above, we find that the police did have probable cause to arrest the defendant.
The judgments of the circuit court are affirmed.
AFFIRMED.
All Judges concur.
[148] "This is stressed in State v. Jordan, 36 Or. App. 45,583 P.2d 1161 (1978), aff'd 288 Or. 391, 605 P.2d 646 (1980), upholding the arrest of two women at a home where the officers went to arrest a single female robbery suspect:
" 'Probable cause may justify the arrest of more than one person. If, for example, a policeman sees A and B bending over a dead ad man and each accuses the other of killing the victim, there is probable cause for either or both and the arrest of A does not preclude the arrest of B. Similarly, if A is found one block north of a recently robbed bank and matches the description of the robber, the arrest of A does not preclude the subsequent arrest of B who also matches the description and is found one block south of the bank.
" 'In either instance, it would be reasonable for the police to arrest both A and B on probable cause even though they believe that only of them committed the crime. The purpose of the arrest, however, is not the traditional and statutory purpose of an arrest: to charge the arrestee with crime. Rather, it is to initiate a short-term process of sorting out, usually on the scene, to determine which person should be charged with crime, i.e., arrested in the full sense of the word.' "