[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION RE DEFENDANT'S MOTION TO SUPPRESS BLOOD EVIDENCE SEIZED PURSUANT TO SEARCH WARRANT
The suppression motion now before the court arises out of an extremely well-known murder case. On July 16, 1973, the body of Concetta ("Penny") Serra was found in the stairway of the Temple Street parking garage in New Haven. The medical examiner determined that she died as the result of a stab wound to the heart. No one was apprehended at the scene. Since that date, the identity of Serra's killer has been, quite literally, a long-standing murder mystery.
Some blood left at the scene and on a tissue box in an automobile used by the victim is thought to be that of the perpetrator. That blood is Type O. Serra's blood was Type A. On July 3, 1984, a man named Anthony Golino was arrested and charged by information with Serra's murder. Statev. Golino, 201 Conn. 435, 436, 518 A.2d 57 (1986). "In May 1987, just prior to the scheduled start of Golino's trial for murder, a court-ordered blood test revealed that Golino's blood type did not match that of the killer. The charges against Golino were then dismissed." Golino v. Cityof New Haven, 950 F.2d 864, 866 (2d Cir. 1991), cert. denied, 505 U.S. 1221
(1992).
With the charges against Golino dismissed, the Serra case remained cold — at least as far as the present court record indicates — for another decade. In 1997, police suspicion began to focus on Edward R. Grant. Grant was born on October 4, 1942 and, in 1997, lived in Waterbury. On September 18, 1997, two inspectors in the Connecticut Division of Criminal Justice made a written application for a search and seizure warrant ("search warrant") for a sample of Grant's blood. The search warrant was signed by the court (Spada, J.) on the same day. It was executed on September 19, 1997, and returned to the court on that latter CT Page 79 date.
Grant was ultimately arrested pursuant to an arrest warrant on June 24, 1999 and charged by information with Serra's murder. The arrest warrant application alleges that the blood thought to be that of the perpetrator is consistent with a DNA profile of the sample of Grant's blood taken pursuant to the search warrant.
On November 20, 2001, Grant filed the suppression motion now before the court. The motion argues that the "search warrant fails to establish probable cause that the defendant's blood sample was connected to the July 16, 1973 homicide of Concetta Serra, or that its seizure would assist in a particular apprehension or conviction." It seeks to suppress "any and all evidence derived from the taking of his blood pursuant to [the] search warrant." The motion was argued on January 3, 2001. For the reasons briefly stated below, the motion must be denied.
Grant's argument is that the allegations in the search warrant affidavit fail to establish probable cause. For this reason, the allegations in the affidavit must be described in some detail.
The affidavit alleges that Serra's blood type is Type A "and that blood scrapings taken from the scene and believed to be that of the perpetrator is Type `O.'" It further states that a tissue box found in the automobile that Serra had been using "also had human blood on it that was determined to be Type `O,' the type of the perpetrator."
Although Golino is not mentioned by name, his 1984 arrest and subsequent exoneration are briefly described. The affidavit states that, "The charge [against him] was dismissed when it was ascertained that his blood type was different than the known type of the perpetrator."
The affidavit then describes certain fingerprint evidence. A latent fingerprint was collected on July 16, 1973 from "Item #2, a Pathmark tissue box that was found in the victim's vehicle." The tissue box was recovered by the New Haven Police "from the rear passenger compartment floor of John Serra's Buick Electra, which the victim used on the day of the murder." Concetta Serra had driven this car to the Temple Street parking garage. "Eye witnesses have stated that her assailant drove this vehicle from the crime scene on the tenth level and abandoned it on the eight level."
According to the affidavit, a report of the State's forensic science laboratory "states that the latent fingerprint discovered on Item #2 (tissue box) was visually compared to inked fingerprints of candidate Edward R. Grant. This comparison resulted in identifying the left thumb CT Page 80 of Edward R. Grant as having made the latent fingerprint developed on Item #2."
The affidavit further states that, "The tissue box also had human blood on it that was determined to be Type `O,' the type of the perpetrator." It then states that:
 14. Dr. Henry Lee, Director of the Connecticut State Police Forensic Science Laboratory, in a report, stated that DNA analysis of the perpetrator's blood scraping, collected from the crime scene and from John Serra's Buick Electra, by New Haven Police, as HLA DQ Alpha alleles 1.2, 3. Dr. Lee's opinion is that type "O" blood and HLA DQ Alpha 1.2, 3 occurs in 5% of the United States caucasian population. Dr. Henry Lee stated that this DNA profile can be compared to other blood samples for identification purposes. At this time there is a suspect under investigation whose blood has genetic markings that are consistent with those of the perpetrator's blood.
 15. On 09/03/97 Edward R. Grant, date of birth October 4, 1942, of 387 Atwood Ave. Waterbury, Ct. was located and interviewed by the affiants. Edward R. Grant was advised that his left thumb print was identified as being found on an item seized by the New Haven Police during the investigation of a serious crime in 1973. Edward R. Grant agreed to and did answer questions related to this issue. Among other things, Edward R. Grant stated his blood type is "O" and that he suffered a serious head injury in a Jeep accident while training in New York State with the United States Army Reserve in 1964, which resulted in four steel plates being placed into his skull, and caused him to have seizures and severe memory lapses. He stated he has little recollection of being in New Haven, Ct. in the early 1970's, but did state that he did some part time work for an auto insurance adjuster in the 1970's, which at times called for him to visit New Haven. Also, because of his head injury he also visited the West Haven Veteran's Hospital occasionally. He could not explain how his fingerprint would have gotten on the Pathmark tissue box, however.
The affidavit further states that John Serra "did not recognize Edward CT Page 81 R. Grant by name or photograph. He could not provide any information that would place Edward R. Grant in his Buick Electra." The car was, however, often parked in Serra's Auto Tune Up Station, where it was occasionally used to take adjusters to appraise damaged vehicles.
The question now before the court is whether the affidavit just described establishes probable cause for the taking of a blood sample.
The standards for evaluating a search warrant in the context of a motion to suppress are well established:
 We uphold the validity of [the] warrant . . . [if] the affidavit at issue presented a substantial factual basis for the magistrate's conclusion that probable cause existed. . . . [T]he magistrate is entitled to draw reasonable inferences from the facts presented. When a magistrate has determined that the warrant affidavit presents sufficient objective indicia of reliability to justify a search and has issued a warrant, a court reviewing that warrant at a subsequent suppression hearing should defer to the reasonable inferences drawn by the magistrate. Where the circumstances for finding probable cause are detailed, where a substantial basis for crediting the source of the information is apparent, and when a magistrate has in fact found probable cause, the reviewing court should not invalidate the warrant by application of rigid analytical categories.
State v. Respass, 256 Conn. 164, 172, 770 A.2d 471, cert. denied,122 S.Ct. 478 (2001). (Internal quotation marks and citation omitted.) "The underlying justification for this deference . . . is that a grudging or negative attitude by reviewing courts toward warrants . . . is inconsistent both with the desire to encourage use of the warrant process by police officers and with the recognition that once a warrant has been obtained, intrusion upon interests protected by the Fourth Amendment is less severe than otherwise may be the case." State v. Diaz, 226 Conn. 514,546, 628 A.2d 567 (1993). (Internal quotation marks and citations omitted.)
Respass identifies three characteristics of the presumptively valid warrant: (1) "the circumstances for finding probable cause are detailed," (2) "a substantial basis for crediting the source of the information is apparent," and (3) "a magistrate has in fact found probable cause."256 Conn. at 172. Each of these three characteristics exists here. (1) The circumstances for finding probable cause are extremely detailed. This is CT Page 82 not a case "made out by affidavits which are purely conclusory, stating only the affiant's or an informer's belief that probable cause exists without detailing any of the "underlying circumstances' upon which that belief is based." United States v. Ventresca, 380 U.S. 102, 108-09
(1965). The affidavit's "[r]ecital of some of the underlying circumstances" enabled the magistrate "to form his detached function and not serve merely as a rubber stamp for the police." Id. at 109. (2) A substantial basis for crediting the source of the information is readily apparent. The affidavit here does not depend on informants of dubious reliability. The information consists of forensic evidence combined with the testimony of eyewitnesses and statements of the defendant himself (3) A magistrate (Spada, J.) has, in fact, found probable cause.
The existence of these characteristics does not automatically validate the warrant. According to Respass, however, "the reviewing court should not invalidate the warrant by application of rigid analytical categories." 256 Conn. at 164. This means that the court should interpret the affidavit in "a commonsense manner" and, to the extent that the case is a "doubtful or marginal" one, it "should be largely determined by the preference to be accorded to warrants." United States v. Ventresca,supra, 380 U.S. at 109.
"Probable cause to search exists if: (1) there is probable cause to believe that the particular items sought to be seized are connected with criminal activity or will assist in a particular apprehension or conviction . . . and (2) there is probable cause to believe that the items sought to be seized will be found in the place to be searched."State v. Smith, 257 Conn. 216, 223, 777 A.2d 182 (2001). (Internal quotation marks and citation omitted.) The item sought to be seized here was the defendant's blood. There is, of course, no doubt, that the blood would be found in the place to be searched, namely in Grant himself. The only question is whether there was probable cause that Grant's blood was "connected with criminal activity or [would] assist in a particular apprehension or conviction." A commonsense reading of the affidavit establishes this criterion as well.
The affidavit establishes that Grant's fingerprint was on a tissue box recovered from the rear passenger compartment floor of the car used by the victim. Grant, when asked, could provide no explanation as to how his fingerprint got on the tissue box, and neither could anyone else. While the affidavit leaves open the possibility that Grant might at some time have been in the car in his capacity as an adjuster, this possibility seems quite remote. The magistrate granting the warrant could appropriately conclude that the more likely explanation is that Grant touched the box during the murder of Penny Serra or its immediate aftermath. CT Page 83
In addition, Grant himself told the affiants that he had Type O blood, the very type taken from the crime scene and the tissue box and believed to be that of the perpetrator. Approximately 43% of caucasians have Type O blood. David Polin, Blood Typing, 40 AM. JUR. PROOF OF FACTS 2d 1, 14 (1984). (Grant's admission of his blood type to the affiants does not contain the additional description of genetic markers necessary to arrive at the lower percentage figure mentioned in ¶ 14 of the affidavit.) Although possession of this common blood type falls well short of overwhelming proof, when combined with the fingerprint on the tissue box it provides probable cause for the issuance of a warrant.
Grant argues that the affidavit's reference to "blood scrapings taken from the scene" is insufficient to establish probable cause that the "blood scrapings" in question are actually those of "the perpetrator." He correctly notes that the affidavit does not specify when or where these scrapings" were made. The affidavit, however, goes on to state that, "The tissue box also had human blood on it that was determined to be Type `O,' the type of the perpetrator." That box, the affidavit declares, "was recovered by the New Haven Police on 7/16/73." In addition, the affidavit recites that, "The charge [against Anthony Golino] was dismissed when it was ascertained that his blood type was different from the known type of the perpetrator." A dismissal is the action of a court. A magistrate could readily infer from this representation that a court had previously found the blood alleged to be that of the perpetrator to actually be that of the perpetrator and to have based an extremely grave decision — the dismissal of a murder case — on that finding. Under all of the circumstances, these contentions are sufficient to allow a magistrate to infer that the Type O blood in question was probably that of the perpetrator.
The question is whether, under "the totality of circumstances";Illinois v. Gates, 462 U.S. 213, 231-32 (1983); seizure of Grant's blood would "assist in a possible apprehension of conviction; State v. Smith, supra, 257 Conn. at 223. Given the reliability of modern DNA testing;see, e.g., State v. Sivri, 231 Conn. 115, 151-61, 646 A.2d 169 (1994); a magistrate reviewing the warrant could appropriately determine that the answer to this question was yes.
Two distinctive features of the search warrant application must now be considered — the application's mention of other suspects and the fact that the taking of a blood sample necessarily involves an invasive procedure.
Without providing names, the affidavit mentions two other suspects — Anthony Golino, whose blood type was determined to be other than that of CT Page 84 the perpetrator, and "a suspect under investigation whose blood has genetic markings that are consistent with those of the perpetrator's blood." The mention of Golino does not reduce the strength of the affidavit at all, because his blood type has ruled him out. The other suspect, whose blood — we are told — has not ruled him out, raises a more complex problem.
The initial question, raised by Grant, is whether the affidavit's reference to "a suspect under investigation whose blood has genetic markings that are consistent with those of the perpetrator's blood" is a misleading reference to Grant himself. While the affidavit's text is less than fully explicit on this point, a moment's reflection negates this analysis. There is no way, given the facts stated in the warrant, that the police could have already known the "genetic markings" of Grant's blood. They merely had his admission that his blood was Type O. If Grant's blood were already known to have "genetic markings that are consistent with those of the perpetrator's blood," there would have been no need for the warrant in the first place. The entire purpose of the warrant was to determine whether Grant's blood did indeed have markings matching the blood of the perpetrator. It follows that the "suspect under investigation" was an individual other than Grant.
Rolling with the punches, Grant's argument then takes another approach. He implicitly argues that, to the extent that another legitimate suspect exists, there cannot be enough probable cause left over for him. "That theory," as the Court of Appeals of Oregon has trenchantly observed, "is no more tenable than would be its opposite: that with probable cause, as with love, there is always plenty for everybody. The statement of principle most harmonious with the fundamental predicate of the Fourth Amendment, reasonableness, fits between those two extremes."State v. Jordan, 583 P.2d 1161, 1163 (Or.Ct.App. 1978), aff'd.,605 P.2d 646 (Or.), cert. denied, 449 U.S. 846 (1980).
"While the law requires that probable cause have a fairly narrow focus, thereby precluding, for example, dragnet operations, we do not believe that the focus must in all situations narrow down to a single suspect." Commonwealth v. Bunch, 477 A.2d 1372, 1379 (Pa.Super. 1984). The Second Restatement of Torts provides an instructive illustration. "A sees B and C bending over a dead man, D. B and C each accuse the other of murdering D. A is not sure that either B or C did the killing, but he has a reasonable suspicion that either B or C killed D. A is privileged to arrest either or both." 1 RESTATEMENT (SECOND) OF TORTS § 119 cmt. j, illus. 2 (1965). Although the Restatement illustration uses the standard of reasonable suspicion, reviewing courts have adopted the illustration as an example of probable cause. Darden v. State,571 So.2d 1272, 1279 n. 148 (Ala.Crim.App.), writ denied, 571 So.2d 1280
CT Page 85 (Ala. 1990); State v. Jordan, supra, 583 P.2d at 1163; Commonwealth v.Bunch, supra, 477 A.2d at 1380-81.
Professor LaFave puts this problem in a helpful analytical context:
 If it . . . may be concluded that the case for permitting arrest of a person even when his guilt isn't more probable than not rests upon the need for investigation, this suggests such an arrest is more likely to be upheld if a showing of that need is made. It would be relevant, for example, that "the less drastic alternative" allowed by Terry [v. Ohio, 392 U.S. 1 (1968)] would not or did not resolve the doubts. The seriousness of the offense . . . would be particularly significant in this setting. And if a group of suspects were arrested for a crime committed by one person, the degree of certainty that the actual offender is within the group would also be important.
2 WAYNE R. LAFAVE, SEARCH AND SEIZURE § 3.2(e) at 67-68 (3d ed. 1996) ("LaFave"). (Footnotes omitted.)
The imposition on Grant in this case was not an arrest. This case involves a search warrant for a blood sample. The intrusive aspects of this search will be discussed in a moment, but whatever intrusion the search involved was surely less than the intrusion involved in being arrested for murder. The constitutional requirement of probable cause remained, but in assessing whether probable cause existed it must be kept in mind that the purpose of the search was an investigative one. If Grant's blood had not matched the blood of the perpetrator, that would have been the end of the matter as far as he was concerned. This is an entirely logical way to proceed with the investigation and one that courts in the modern era should embrace. In fact, one of Anthony Golino's most persuasive arguments in the civil action that he brought following his exoneration was that the police had not tested his blood prior to arresting him. Golino v. City of New Haven, supra, 950 F.2d at 871-72.
As Professor LaFave points out, the seriousness of the offense at issue is also a significant factor. This case involves murder — the most serious offense of all. There is no obvious "less drastic alternative" to the taking of a blood sample. Grant suggests no alternative course of action that could be sensibly be followed in these circumstances. As Jackson, J. observed long ago, "The alternative was to close the books on the crime and forget it, with the suspect at large. This is a grave choice for [our] society." Watts v. Indiana, 338 U.S. 49, 58 (1949) (opinion of Jackson, J.). Under the totality of circumstances, the CT Page 86 magistrate signing the search warrant had a substantial basis for doing so.
One final aspect of the warrant remains to be considered. This was a warrant for a sample of blood, and the taking of a sample of blood necessarily requires some physical intrusion into the body of the suspect. The intrusion in question, the insertion of a needle into a blood vessel, is quite routine for most people in modern society, but it is a physical intrusion nonetheless. The Supreme Court has held that, "The interests in human dignity and privacy which the Fourth Amendment protects forbid any such intrusions on the mere chance that desired evidence might be obtained." Schmerber v. California, 384 U.S. 757,769-70 (1966). There must, instead, be "a clear indication that in fact such evidence will be found." Id. at 770.
As Professor LaFave points out, the "precise meaning" of Schmerber's
"clear indication" test "is less than clear." 2 LaFave § 4.1(e) at 414. He suggests that it can be sensibly interpreted in the light of the Supreme Court's later pronouncement that "there can be no ready test for determining reasonableness other than by balancing the need to search against the invasion which the search entails." Camara v. MunicipalCourt, 387 U.S. 523, 536-37 (1967). 2 LaFave § 4.1(e) at 414. The Supreme Court has subsequently affirmed the correctness of this approach. In Whren v. United States, 517 U.S. 806 (1996), the Court explained that a ""balancing' analysis is required in searches involving a "physical penetration of the body." Id. at 818. See Atwater v. City ofLago Vista, 121 S.Ct. 1536, 1557-58 (2001).
The appropriate application of Schmerber's "clear indication" test is thus to balance "the need to search against the invasion which the search entails." Camara v. Municipal Court, supra, 387 U.S. at 537. In this case, the magistrate signing the search warrant appropriately could have determined that the need to obtain a sample of Grant's blood outweighed the invasion that the search entailed. The need to obtain a sample of Grant's blood was high. His fingerprint had been found on a tissue box in the automobile used by the victim, he had no explanation as to how the fingerprint could have gotten there, and his blood was of the same type — Type O — as that of the perpetrator. There was considerable reason to believe that a blood sample would either exonerate him or identify him as the killer. The community had a strong "interest in fairly and accurately determining guilt or innocence." Winston v. Lee, 470 U.S. 753, 762
(1985).
On the other hand, the invasion that the search would entail was minimal. The taking of the blood sample here was not comparable in magnitude to the stomach-pumping in Rochin v. California, 342 U.S. 165
CT Page 87 (1952), or the proposed surgical invasion in Winston v. Lee, supra. "A crucial factor in analyzing the magnitude of the intrusion in Schmerber
is the extent to which the procedure may threaten the safety or the health of the individual. `[F]or most people [a blood test] involves virtually no risk, trauma, or pain.'" Winston v. Lee, supra,470 U.S. at 761
(quoting Schmerber v. Calfornia, supra, 384 U.S. at 771). The warrant in this case ordered that the seizure of Grant's blood was "to be performed by properly trained and qualified personnel in a safe and appropriate manner that poses no significant risk of injury (beyond that necessary to the procedure itself) or impairment of [Grant's] health." Under these circumstances, the invasion that the search would entail, while real, was slight.
Because the affidavit at issue presented a substantial factual basis for the magistrate to conclude that the need to search outweighed the invasion which the search would entail, Schmerber's "clear indication" test was satisfied.
The motion is denied.
 Jon C. Blue Judge of the Superior Court