STATE OF CONNECTICUT *v.* RUBEN DIAZ
(14554)

PETERS, C. J., CALLAHAN, BORDEN, BERDON and KATZ, Js.

---

Argued February 9—decision released July 20, 1993

*Adam J. Teller,* special public defender, for the appellant (defendant).

*Margaret Gaffney Radionovas,* deputy assistant state's attorney, with whom, on the brief, were *John T. Redway,* state's attorney, and *Bernadette Conway,* assistant state's attorney, for the appellee (state).

BORDEN, J. The certified issue in this appeal is whether a criminal defendant is entitled, pursuant to article first, § 7, of the Connecticut constitution, and

General Statutes § 54-33f,[1] to de novo review of an issuing judge's determination that probable cause existed to issue a search warrant. The defendant, Ruben Diaz, appeals, upon our grant of certification, from the judgment of the Appellate Court reversing the trial court's granting of the defendant's motion to suppress. We affirm the judgment of the Appellate Court.

The record reveals the following facts. The police submitted an application for a search warrant to Judge Joseph T. Gormley of the Superior Court. The application requested authorization to search the defendant's house at 36 Clinton Avenue in Old Saybrook for cocaine, cocaine related paraphernalia and other items commonly used in drug transactions. Attached to the application was the affidavit of state police officer Chester Harris and officer Cliff Barrows of the Old

[1] Article first, § 7, of the Connecticut constitution provides: "The people shall be secure in their persons, houses, papers and possessions from unreasonable searches or seizures; and no warrant to search any place, or to seize any person or things, shall issue without describing them as nearly as may be, nor without probable cause supported by oath or affirmation."

General Statutes § 54-33f provides: "MOTION FOR RETURN OF UNLAWFULLY SEIZED PROPERTY AND SUPPRESSION AS EVIDENCE (a) A person aggrieved by search and seizure may move the court which has jurisdiction of his case or, if such jurisdiction has not yet been invoked, then the court which issued the warrant, or the court in which his case is pending, for the return of the property and to suppress for use as evidence anything so obtained on the ground that: (1) The property was seized without a warrant, or (2) the warrant is insufficient on its face, or (3) the property seized is not that described in the warrant, or (4) there was not probable cause for believing the existence of the grounds on which the warrant was issued, or (5) the warrant was illegally executed. In no case may the judge who signed the warrant preside at the hearing on the motion.

"(b) The motion shall be made before trial or hearing unless opportunity therefor did not exist or the defendant was not aware of the grounds for the motion, but the court in its discretion may entertain the motion at the trial or hearing.

"(c) The court shall receive evidence on any issue of fact necessary to the decision of the motion. If the motion is granted, the property shall be restored unless otherwise subject to lawful detention and it shall not be admissible in evidence at any hearing or trial."

Saybrook police department. Each officer stated that he had extensive training and experience in narcotics investigations and enforcement.

The information provided in the affidavit can be summarized as follows.[2] On the basis of information

[2] The affidavit states in relevant part: "The undersigned, being duly sworn, complains on oath that the undersigned has probable cause to believe that certain property, to wit:

"Cocaine, cutting agents, packaging materials, scales, drug paraphernalia as defined in section 21a-240 (2) (A), monies derived from the sale of narcotics, jewelry, records of narcotics transactions, firearms as defined in section 53a-2 (10) and ammunition, dangerous weapons, police scanning equipment, telephone answering machines, telephone paging systems, telephone toll records, photographs, safety deposit box keys and/or records of safety deposit boxes and proof of residence.

"[I]s possessed, controlled, designed or intended for use or which is or has been or may be used as the means of committing the criminal offense of: Possession of Cocaine, 21a-279 (a)[;] Possession of Cocaine With Intent to Sell, 21a-278 (b) . . . .

"And is within or upon a certain person, place, or thing, to wit:

"#36 Clinton Ave., Old Saybrook, CT. This dwelling being a white cape cod style house, color white with an attached two car garage. The person of Ruben Diaz, hispanic male, DOB 3/10/52. 1977 Ford pickup truck, color brown, bearing CT Reg. H-32843.

\* \* \*

"#4) On or about 08/18/89 the affiant Harris and Det. Nobile executed a search and seizure warrant at the residence of one Benjamin Perez an Hispanic male d.o.b. 10/23/66 located at # 48 Bradley St. Apt. 1 Branford, Ct. Located at the residence at the time the warrant was executed was Benjamin Perez D.O.B. 10/23/66. Seized incident to the execution of this warrant were the following items, packaging material consisting of numerous small zip lock baggies, a handgun with loaded clip, $1620.00 in cash, included in this cash was a quantity of state funds utilized in a controlled purchase of narcotics from within the residence. Also seized was a 12 ga shotgun, a police scanner, a black plastic scale typically used in the weighing of narcotics for sale. No suspected narcotics were seized at this time and Perez was therefore not placed under arrest. Located at the residence at this time was a 1980 Caddy color red, vin. # 61579AE618941, Connecticut registration 621GDD.

"#5) On 08/18/89 at the time of the execution of the above mentioned search warrant one Ralph Pomeroy was arrested. Pomeroy was arrested on a charge of Criminal Attempt Purchase Narcotics. This arrest resulted from the following circumstance. While at the residence Det. Beckley

obtained from reliable informants and surveillance of controlled narcotics buys, the affiants asserted that

answered the phone the caller on the other end asked for Benji. Det. Beckley engaged this caller in a narcotics related conversation in which the caller stated he wanted to buy a gram from Benji. The caller was told to come to the residence by Det. Beckley. Shortly after this Pomeroy arrived and Det. Beckley showed Pomeroy a simulated baggy of cocaine. Following his arrest Pomeroy did provide a written statement. In this statement Pomeroy stated that he had called Ben at his residence on 08/18/89 and had been told by Ben that he had sold his last amount of cocaine. Pomeroy stated that he later called back to see if Ben had gotten any cocaine in. This resulted in his conversation with Det. Beckley. Pomeroy did state to the affiant Harris that he had been introduced to Perez by another Hispanic male named Ruben.

"#6) During the month of December 1989 the affiant Harris was contacted by a known and reliable informant. This informant had provided the original information that led to the execution of the search warrant at Perez' residence on 08/18/90. This informant in the past had provided information that led to the execution of a search and seizure warrant the seizure of narcotics and the arrest and conviction of the individual responsible. In addition this informant has provided information that has led to the undercover purchase of narcotics from suspect on three separate occasions. On this occasion the informant stated that he/she had been present when a delivery of narcotics was made by Perez to a third person. This delivery of narcotics occurred during the month of December of 1989.

"#7) Also during the month of December of 1989 the affiant Harris was contacted by a concerned person regarding the narcotics sales of Benjamin Perez. This concerned person stated that he/she was contacting the police because he/she was concerned about the effects Perez's narcotics sales were having on other persons. This concerned person stated that he/she had personal knowledge obtained from observation that Perez had given a quantity of cash obtained from narcotics sales to a third person. That Perez had given this cash to the third person to avoid it's [sic] being seized by the police.

"#8) That in the first week of January of 1990 Officer Santry of the Clinton Police Department was contacted by a known and reliable informant. This informant has in the past provided in the past that led to the execution of a search warrant, the seizure of narcotics, and the arrest of a suspect and subsequent conviction. This informant stated that he/she familiar with a Hispanic male named Benji who in his mid twenties, dark hair and thinly built. This informant stated that Benji operates a red early 1980's Caddy. The informant stated he/she has been with a third person on eight to ten occasion[s] when this third person has purchased cocaine from Benji. The last sale occurring on or about 01/02/90 at the Happy Dolphin Motel

Benjamin Perez and the defendant had been jointly
engaged in selling narcotics, including cocaine, since

located on Rt. 1 in Clinton. This informant later took Officer Santry to the
Happy Dolphin Motel where the informant did point out the cabin that the
sale had taken place in.

"#9) In the week of January 12, 1990 to January 19, 1990 the affiant
Harris with an informant regarding the narcotics sales of an individual the
informant knew as Benji. This informant has in the past provided infor-
mation that has led to the controlled purchase of narcotics on one occa-
sion. The informant stated that Benji was a Hispanic male, about age 25,
who operates a red car the make of which the informant was unsure of.
This informant stated he/she had known Benji about four or five months.
The informant stated that within the month prior to 1/12/90 the informant
had observed Benji conduct three to four sales of Cocaine. Continuing the
informant stated that Benji had a relative whose last name was Perez. This
relative cooperated with Benji in the sale of narcotics.

"#10) That During the week of January 22, 1990 the affiant Harris accom-
panied by Officer Santry of the Clinton Police Department met with a known
and reliable informant. This informant has in the past provided informa-
tion that has resulted in the execution of four search warrant[s]. These exe-
cution[s] resulting in the seizure of narcotics and the arrest and conviction
of those responsible. Said informant stated that he/she had personal knowl-
edge based on observations made by the informant that one Benjamin Perez
is currently involved in the sale of narcotics. This informant stated that
he/she has observed Perez in Possession of narcotics within the last ten
days. The informant stated that he/she has observed Perez conduct numer-
ous narcotics sales in the recent past. Continuing the informant stated that
he/she knows that Perez operates a 1980 Cadillac color red. The informant
stated that Perez routinely transports narcotics within this vehicle and on
his person. The informant also stated that it is Perez's habit to carry a fire-
arm on his person.

"#11) That during the first week of March of 1990 the affiant Barrows
was contacted by a known and reliable informant. This informant has in
the past provided information that has proved to be true and accurate. This
information has resulted in the issuance of search and seizure warrants
with arrests and convictions resulting. At this time the informant stated
that she/he was familiar with a Hispanic male named Ruben Diaz who resides
at #36 Clinton Ave. Old Saybrook, Ct. This informant stated that she/he
had personal knowledge based on the informant['s] observations that Diaz
was involved in the sale of narcotics namely cocaine. The informant stated
that during the first week of March the informant had been present when
a narcotics transaction had taken place between Diaz and a third person.
The informant stated that the proceeds of that transaction had been col-
lected by Diaz. These funds were then turned over to another Hispanic male
who took them into #34 Clinton Ave., Old Saybrook, Ct. The informant

March, 1990. At the time the application was filed, Perez resided at 34 Clinton Avenue in Old Saybrook.

described this third Hispanic male as being about 25 years of age, about 6 feet tall, slim build, with short dark hair, who operated a early eighties Caddy color red.

"#12) The affiant Barrows is familiar with the above mentioned subject Diaz. The affiant Barrows had prior to speaking with this informant received information in the course of his routine duties that Diaz was involved in the sale of narcotics. In addition Barrows did know that Diaz resided at #36 Clinton Ave., in Old Saybrook, Ct. Also Barrows has knowledge that one Benjamin Perez of #34 Clinton Ave., Old Saybrook is an associate of Ruben Diaz. That the affiant Harris knows the description provided by the informant to match that of Benjamin Perez.

"#13) That during the week of March 22, 1990 the affiant Barrows was contacted by a concerned person regarding suspect drug activity at #34 Clinton Ave., Old Saybrook, Ct. This concerned person stated that there is a large volume of traffic that comes down Clinton Ave and arrives at #34 Clinton Ave. This concerned person stated that these persons enter #34 Clinton Ave. and remain therein for a short period of time. The concerned person stated that he/she felt the traffic was narcotics related due to the volume of traffic and the period.

"#14) That during the week of March 19, 1990 to March 26, 1990 the affiants met with the above mentioned informant. The purpose of this meeting being to attempt a controlled purchase of narcotics from Diaz. Prior to attempting this the informant was searched and found to be free of contraband and monies. Following this the informant was provided with a quantity of state funds and then kept under surveillance. The informant was observed to arrive at #36 Clinton Ave. There the informant met with Diaz. According to the informant he/she had a narcotics related conversation with Diaz. This resulted in a Hispanic male bringing a quantity of white powder from # 34 Clinton Ave. to # 36 Clinton Ave. Following this transaction the informant met the affiants at a prearranged location. There the informant did turn over a quantity of white powder. A [portion] of this white powder was field tested by the affiant Harris and a positive result for the presence of cocaine was obtained.

"#15) That during the week March 30, 1990 the affiants did conduct a random surveillance of # 34 and 36 Clinton Ave. in Old Saybrook. That the subjects Diaz and Perez are known to the affiants. That while conducting this surveillance the affiants did observe both Diaz and Perez enter Ct. reg. 621GDD.

"#16) That during the week of March 31, 1990 the affiants again met with the known and reliable informant. The purpose again being to attempt a controlled purchase of narcotics from # 34 and 36 Clinton Ave. in Old Saybrook. Prior to attempting this the informant was searched and found to be free of contraband and monies. The informant was again provided

A "concerned person" reported to the police that a large number of individuals, consistent with narcotics trafficking, had been entering and exiting Perez' residence at 34 Clinton Avenue. Pursuant to a valid warrant, police previously had searched Perez' former

with a quantity of state funds and then kept under surveillance. Following this the informant was observed to arrive at #36 Clinton Ave. There he was observed to meet with Diaz. Following this the informant stated that the Hispanic male from #34 Clinton Ave. did bring a quantity of white powder from #34 Clinton Ave. to #36 Clinton Ave. Following the transaction the informant again met with the affiants at a prearranged location. There the informant did turn over a quantity of white powder. That the affiant Harris did field test a portion of this white powder and did receive a positive reaction for the presence of cocaine.

"#17) That the affiants obtained the following descriptions of #34 and 36 Clinton Ave Old Saybrook Ct. That #34 Clinton Ave. is a yellow cape cod style dwelling. That #36 Clinton Ave. is a white cape cod style house with an attached two car garage.

"#18) That the affiants did check the records of SPBI and in so doing learned that Ruben Diaz D.O.B. 03/10/52 has been arrested for the crimes of Forgery and Larceny and Failure to Appear. That all of these cases are currently listed as pending. In checking the records of the Old Saybrook Police it was learned that Diaz was arrested on an outstanding warrant on or about 10/10/89. On this occasion a quantity of white powder was seized from his person. A portion of this white powder was field tested and a positive reaction for the presence of cocaine was obtained.

"#19) That the affiant[s] know from their training and experience that those persons involved in a sale of narcotics will routinely store narcotics within their residence. They do this to protect the narcotics from theft and to facilitate the sale of narcotics. . . .

"#20) That the affiants did check the records of the Department of Motor Vehicles. In so doing it was learned that Ruben Diaz d.o.b. 03/10/52 has registered in his name Ct. reg. H32843 a 1977 Ford pick-up, color brown VIN#F25SE024912 listed to #36 Clinton Ave., Old Saybrook, Ct. That Ct. reg 621 GDD is listed to one Himilce Perez of Box 429 Clinton, Ct this vehicle being a 1980 Caddy Eldorado, color red, VIN#6L579AE618941. In addition Perez has registered to him Ct reg. 208FXF a 1963 Chevy, color white, VIN#31569G111327. That the affiants did check the records of the Southern New England Telephone Company and in so doing learned that Benjamin Perez is the subscriber for the telephone facility at #34 Clinton Ave. Old Saybrook Ct. That the affiants have observed CT reg. H32843 parked at #36 Clinton Ave. on numerous occasions. In addition the affiants have observed Ct reg. 621GDD and 208FXF parked at #34 Clinton Ave. Old Saybrook, Ct. on numerous occasions."

residence located at 48 Bradley Street in Branford, during which they had seized a gun, packaging material for narcotics, a scale and cash that had been used in a "controlled buy."

The defendant resided at 36 Clinton Avenue, next door to Perez. The defendant was first seen by a known and reliable informant taking part in a drug transaction during the first week of March, 1990. During that transaction, the defendant, having received cash from a third person, turned the proceeds over to an individual matching Perez' description, who in turn entered 34 Clinton Avenue.

The police then arranged with a reliable informant for two controlled buys of cocaine from the defendant. On both occasions, the informant met with the defendant at 36 Clinton Avenue and "had a narcotics related conversation with [the defendant that] resulted in a Hispanic male bringing a quantity of white powder from # 34 Clinton Ave. to # 36 Clinton Ave." Each time the white powder tested positive for the presence of cocaine.

On the basis of the information contained in the affidavit, Judge Gormley issued a warrant authorizing the police to search the defendant's residence at 36 Clinton Avenue for cocaine and cocaine related paraphernalia. Police executed the warrant and seized cocaine, cocaine related paraphernalia and a shotgun. The state thereafter charged the defendant with possession of narcotics with intent to sell in violation of General Statutes § 21a-278 (b).[3]

---

[3] General Statutes § 21a-278 (b) provides: "Any person who manufactures, distributes, sells, prescribes, dispenses, compounds, transports with the intent to sell or dispense, possesses with the intent to sell or dispense, offers, gives or administers to another person any narcotic substance, hallucinogenic substance other than marijuana, amphetamine-type substance, or one kilogram or more of a cannabis-type substance except as authorized in this chapter, and who is not at the time of such action a drug-dependent per-

The defendant moved to suppress the evidence seized, claiming that the application did not establish probable cause to believe that cocaine would be found at the defendant's residence at 36 Clinton Avenue. After reviewing the warrant and hearing arguments on the motion to suppress, the trial court, *Hendel, J.*, granted the defendant's motion. The trial court concluded that the affidavit failed to establish probable cause to believe that narcotics would be found at the defendant's residence at 36 Clinton Avenue. The trial court dismissed the case upon the state's representation that, without the evidence, the state could not proceed. The trial court then granted the state permission to appeal pursuant to General Statutes § 54-96.[4]

The state appealed to the Appellate Court, claiming that the trial court should have deferred to Judge Gormley's probable cause determination because there was a substantial factual basis for that decision. After applying the substantial basis test, the Appellate Court agreed with the state and reversed the judgment of the trial court and remanded the case with direction to deny the motion to suppress. *State* v. *Diaz,* 27 Conn. App. 427, 607 A.2d 439 (1992). We granted the defendant's petition for certification to appeal, limited to the fol-

son, for a first offense shall be imprisoned not less than five years nor more than twenty years; and for each subsequent offense shall be imprisoned not less than ten years nor more than twenty-five years. The execution of the mandatory minimum sentence imposed by the provisions of this subsection shall not be suspended except the court may suspend the execution of such mandatory minimum sentence if at the time of the commission of the offense (1) such person was under the age of eighteen years or, (2) such person's mental capacity was significantly impaired but not so impaired as to constitute a defense to prosecution."

[4] General Statutes § 54-96 provides: "APPEALS BY THE STATE FROM SUPERIOR COURT IN CRIMINAL CASES. Appeals from the rulings and decisions of the superior court, upon all questions of law arising on the trial of criminal cases, may be taken by the state, with the permission of the presiding judge, to the supreme court or to the appellate court, in the same manner and to the same effect as if made by the accused."

lowing question: "Do article first, § 7, of the constitution of the state of Connecticut, Connecticut General Statutes § 54-33f and Practice Book § 822 (4)[5] entitle the defendant to de novo review of the issue of probable cause, rather than the deferential review undertaken by the Appellate Court?" *State* v. *Diaz,* 223 Conn. 903, 610 A.2d 177 (1992).[6] We now answer this question in the negative.

I

Some background is in order.[7] First, the determination of whether probable cause exists to issue a search warrant under article first, § 7, of our state constitution is made pursuant to a "totality of the circumstances" test. *State* v. *Barton,* 219 Conn. 529, 544, 594 A.2d 917 (1991). In determining the existence of probable cause to search, the issuing judge must make a "practical, nontechnical decision whether, given all the

[5] Practice Book § 822 provides: "—RETURN OF SEIZED PROPERTY

"A person aggrieved by a search and seizure may make a motion to the judicial authority who has jurisdiction of his case, or if such jurisdiction has not yet been invoked, then to the judicial authority who issued the warrant or to the court in which his case is pending, for the return of specific items of property and to suppress their use as evidence on the grounds that:

"(1) The property was illegally seized without a warrant under circumstances requiring a warrant;

"(2) The warrant is insufficient on its face;

"(3) The property seized is not that described in the warrant;

"(4) There was not probable cause for believing the existence of the grounds on which the warrant was issued; or

"(5) The warrant was illegally executed."

The defendant has withdrawn his claim that § 822 requires de novo review of the issuing judge's determination of probable cause.

[6] Because we granted certification to appeal limited to this issue, we do not address the defendant's claim that the Appellate Court improperly concluded that the warrant was supported by probable cause.

[7] Because the decision as to whether a search warrant should be issued has been delegated in this state to a judge of the Superior Court; see General Statutes § 54-33a; we refer to this official as the issuing judge rather than the issuing magistrate, except when quoting previous decisions. For the purposes of this appeal, however, the terms are synonymous.

circumstances set forth in the warrant affidavit, including the 'veracity' and the 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *State* v. *Johnson,* 219 Conn. 557, 563, 594 A.2d 933 (1991). "In making this determination, the magistrate is entitled to draw reasonable inferences from the facts presented. When a magistrate has determined that the warrant affidavit presents sufficient objective indicia of reliability to justify a search and has issued a warrant, a court reviewing that warrant at a subsequent suppression hearing should defer to the reasonable inferences drawn by the magistrate." *State* v. *Rodriguez,* 223 Conn. 127, 135, 613 A.2d 211 (1992).

We have repeatedly held, therefore, that a reviewing court must uphold "the validity of [the] warrant . . . [if] the affidavit at issue presented a substantial factual basis [including the inferences reasonably drawn from the affidavit] for the magistrate's conclusion that probable cause existed." (Internal quotation marks omitted.) *State* v. *DeFusco,* 224 Conn. 627, 642, 620 A.2d 746 (1993); *State* v. *Duntz,* 223 Conn. 207, 215, 613 A.2d 224 (1992); *State* v. *Rodriguez,* supra, 135; *State* v. *Barton,* supra, 544. "In a doubtful or marginal case . . . our constitutional preference for a judicial determination of probable cause leads us to afford deference to the magistrate's . . . conclusion that the affidavit established probable cause." (Internal quotation marks omitted.) *State* v. *DeFusco,* supra.

Second, it is necessary to set out what we mean by the "substantial basis" scope of review of a warrant as applied to this case. The difference between what the issuing judge did and what the trial court did not do, and between what the Appellate Court did and what the trial court did not do, involves the drawing of the inference from the affidavit of whether narcotics would

be found at the defendant's residence at 36 Clinton Avenue. The issuing judge drew the inference that narcotics would be found at that address, and the Appellate Court sustained that determination as a reasonable inference to be drawn from the affidavit. The trial court, on the contrary, declined to draw that inference from the affidavit.

We proceed under the certified question in this appeal on the necessary assumption that the issuing judge's inference was a reasonable inference, albeit not a necessary inference. If it were not a reasonable inference, the scope of review would be immaterial, because even under a "substantial basis" test we do not endorse *unreasonable* inferences.[8] If an inference drawn by an issuing judge is unreasonable, and that inference is critical to the ultimate determination of probable cause, the warrant is defective regardless of the scope of review employed to analyze the affidavit. See, e.g., *State* v. *Duntz,* supra, 220–21. The defendant, in fact, does not dispute that the issuing judge is entitled to draw reasonable inferences; rather, he challenges the standard by which those inferences should be reviewed. Moreover, the assumption that the inference was reasonable is implicit in our limited grant of certification to the legal issue of whether article first, § 7, requires de novo review. See footnote 6.

---

[8] The process of making the legal determination of whether a particular inference drawn by a fact finder is reasonable, as opposed to the process of determining whether to draw such an inference, is particularly familiar to a reviewing court. That is the essence of the difference between a question of law, to be answered by a reviewing court, and a question of fact, to be answered by a fact finder. Both trial and appellate courts routinely engage in that process of review in ruling on motions for judgment of acquittal; see, e.g., *State* v. *Raguseo,* 225 Conn. 114, 119, 622 A.2d 519 (1993); and in ruling on motions to suppress evidence on the basis that there was no probable cause for a warrant; see, e.g., *State* v. *Rodriguez,* 223 Conn. 127, 613 A.2d 211 (1992); or for a warrantless search. See, e.g., *State* v. *Blades,* 225 Conn. 609, 617, 626 A.2d 273 (1993).

In cases like the present one, therefore, the substantial basis test has bite only if the inference drawn by the issuing judge is reasonable. Consequently, the substantial basis test means that the reviewing court must give deference to—must take as a given—all *reasonable* inferences drawn by the issuing judge, and then decide whether, based upon the facts explicitly stated in the affidavit, supplemented by those reasonable inferences, the affidavit establishes probable cause.

Thus, the question of whether to apply the substantial basis test or de novo review distills into the question of whether the reviewing trial court should, on the one hand, give deference to the reasonable inference drawn by the issuing judge, or, on the other hand, is constitutionally required to engage in its own inference-drawing process and thus decline, as the trial court presumably did in this case,[9] to draw the same inference as was drawn by the issuing judge on the basis of the trial court's own sense of what reasonable inferences should or should not be drawn from the affidavit. Put another way, the question is: must the reviewing trial

---

[9] Although it is not entirely clear, the reviewing court in this case may have concluded that the necessary inferences drawn by the issuing judge were *unreasonable*. The trial court stated: "I believe that if there were a warrant for 34 Clinton Avenue there would be no problem, however, the warrant is not for 34 Clinton Avenue but for 36 Clinton Avenue. . . .

"This case is closer [than the case cited by counsel] in that there were transactions which took place in the apartment whereupon there were some in the apartment. The informant said they came [from] that location so I think what you have to conclude is that the drugs were kept at 34 [Clinton Avenue] and the purchases took place at 36 [Clinton Avenue] and the drugs were then brought over from 34 [Clinton Avenue] and it may very well be that the cash went back to 34 [Clinton Avenue] but you can't *reasonably* believe from this warrant that the drugs were kept at 36 [Clinton Avenue]." (Emphasis added.) Consequently, the reviewing judge, if he properly concluded that such an inference was unreasonable, may have, in fact, reached that conclusion by employing the substantial basis test. For the purposes of this appeal, however, we proceed on the assumptions that: (1) the trial court did not give deference to the inference drawn by the issuing judge; and (2) the inference was reasonable.

court put itself into the stance of the issuing judge and substitute its judgment of whether to draw the same—presumptively reasonable—inference that the issuing judge drew?

The defendant argues in effect that the reviewing trial court must decide *for itself* whether: (1) to draw the same reasonable inference; or (2) to decline to draw the same reasonable inference. The state argues that, because the inference is reasonable, the reviewing court should give deference to it, and review the sufficiency of the affidavit given that inference. We agree with the state.

## II

The defendant first claims that General Statutes § 54-33f, independent of article first, § 7, requires a trial court to engage in de novo review of an issuing judge's probable cause determination if the validity of the warrant is challenged by a motion to suppress. We disagree.

We have previously held that § 54-33f did not create new substantive rights for criminal defendants but was enacted merely to set forth the appropriate procedural mechanism by which to bring a motion to suppress. *State* v. *Marsala,* 216 Conn. 150, 157, 579 A.2d 58 (1990). Section 54-33f was enacted in response to the United States Supreme Court's decision in *Mapp* v. *Ohio,* 367 U.S. 643, 81 S. Ct. 1684, 6 L. Ed. 2d 1081, reh. denied, 368 U.S. 871, 82 S. Ct. 23, 7 L. Ed. 2d 72 (1961), which held that the constitutionally based exclusionary rule is applicable to the states through the fourteenth amendment. Prior to *Mapp,* neither our Practice Book nor our statutes contained an express provision for a motion to suppress. *State* v. *Marsala,* supra. We have refused, therefore, to read into § 54-33f any intent by the legislature to provide anything beyond the procedural mechanism by which the dictates of

*Mapp* v. *Ohio,* supra, could be satisfied. *State* v. *Marsala,* supra. Consequently, we reject the defendant's contention that the plain language of the statute and its underlying purpose require de novo review.

The defendant also argues that a subsequent amendment to § 54-33f establishes that the legislature intended to establish de novo review of the issuing judge's probable cause determination. In 1967, the legislature amended § 54-33f to prohibit a judge of the Superior Court who had signed a warrant from considering a motion to suppress evidence seized pursuant to that warrant. Public Acts 1967, No. 4. We read this public act as having incorporated into the statute the commonsense notion that a judge should not review his own acts, rather than as having created a substantive right to a particular standard of review. Indeed, the legislative history indicates that this was the sole purpose of the statute, and that the statute was aimed at eliminating a contrary practice prevailing in the then Connecticut Circuit Court. 12 H.R. Proc., Pt. 2, 1967 Sess., pp. 702–703. Consequently, in the absence of any language in § 54-33f to indicate that the legislature intended to establish a particular standard of review of an issuing judge's probable cause determination, and in light of the purposes for which the statute was enacted, we conclude that the defendant's statutory claim is without merit.

### III

The defendant next claims that, despite the United States Supreme Court's conclusion that the "substantial basis test" applies under the federal constitution, article first, § 7, of the Connecticut constitution entitles him to de novo review of the issuing judge's determination that probable cause existed to issue the warrant. We are unpersuaded.

A

"It is well established that federal constitutional and statutory law establishes a minimum national standard for the exercise of individual rights and does not inhibit state governments from affording higher levels of protection for such rights. . . . *Cologne* v. *Westfarms Associates,* 192 Conn. 48, 57, 469 A.2d 1201 (1984). *State* v. *Barton,* [supra, 546]. . . . [W]e have frequently relied upon decisions of the United States Supreme Court interpreting the fourth amendment, as well as other amendments to the United States constitution, to define the contours of the protections provided in the various sections of the declaration of rights contained in our state constitution. We have also, however, determined in some instances that the protections afforded to the citizens of this state by our own constitution go beyond those provided by the federal constitution, as that document has been interpreted by the United States Supreme Court. *State* v. *Dukes,* 209 Conn. 98, 112, 547 A.2d 10 (1988); *State* v. *Stoddard,* 206 Conn. 157, 166, 537 A.2d 446 (1988); *State* v. *Kimbro,* 197 Conn. 219, 235–36, 496 A.2d 498 (1985)." (Internal quotation marks omitted.) *State* v. *Geisler,* 222 Conn. 672, 684, 610 A.2d 1225 (1992).

The issue in this case, therefore, is whether our state constitution affords greater protection for criminal defendants against illegal searches and seizures than the federal constitution by requiring the trial court to engage in de novo review of whether probable cause existed to issue the warrant. "In order to construe the contours of our state constitution and reach reasoned and principled results, the following tools of analysis [are] considered to the extent applicable: (1) the textual approach; see, e.g., *Stolberg* v. *Caldwell,* 175 Conn. 586, 597–98, 402 A.2d 763 (1978), appeal dismissed sub nom. *Stolberg* v. *Davidson,* 454 U.S. 958, 102 S. Ct.

496, 70 L. Ed. 2d 374 (1981) ('Unless there is some clear reason for not doing so, effect must be given to every part of and each word in the constitution.'); (2) holdings and dicta of this court, and the Appellate Court . . . (3) federal precedent; see, e.g., *State* v. *Lamme,* 216 Conn. 172, 184, 579 A.2d 484 (1990) ('The adoption of federal constitutional precedents that appropriately illuminate open textured provisions in our own organic document in no way compromises our obligation independently to construe the provisions of our state constitution.'); (4) sister state decisions or sibling approach; see, e.g., *State* v. *Gethers,* 197 Conn. 369, 386–87, 497 A.2d 408 (1985); *Cologne* v. *Westfarms Associates,* supra, 58–59; (5) the historical approach, including the historical constitutional setting and the debates of the framers; see, e.g., *State* v. *Lamme,* supra, 178–80; *Cologne* v. *Westfarms Associates,* supra, 60–62; *Palka* v. *Walker,* 124 Conn. 121, 126, 198 A. 265 (1938); and (6) economic/sociological considerations. See *State* v. *Barton,* supra, 546; *State* v. *Dukes,* supra, 115; see generally *State* v. *Jewett,* 146 Vt. 221, 500 A.2d 233 (1985); M. Margulies, 'Connecticut's Free Speech Clauses: A Framework and an Agenda,' 65 Conn. B.J. 437 (1991) (an analytical framework for state constitutional analysis in the context of the free speech clauses); E. Peters, 'State Constitutional Law: Federalism in the Common Law Tradition,' 84 Mich. L. Rev. 583 (1986) (book review).'' (Citations omitted.) *State* v. *Geisler,* supra, 684–86.

## B

The defendant first argues that both the plain language of article first, § 7, and the historical background of that provision, compel de novo review of the issuing judge's probable cause determination. We disagree.

Although article first, § 7, states that no warrant shall issue but upon probable cause, the language of

that provision in no way addresses the separate question of the appropriate standard of review after a judicial officer has issued a warrant upon a conclusion that probable cause in fact existed. Like its federal counterpart, article first, § 7, is an open textured provision designed to express in a broad manner the various protections afforded to the populace. See *State* v. *Barton,* supra, 545. It is this court's obligation to construe the open-ended terms of our state constitution to reach reasoned and principled results. *State* v. *Geisler,* supra, 684. Given the open textured and broad nature of these terms, the defendant's plain language argument fails.

The defendant next directs our attention to the historical setting in which article first, § 7, was adopted.[10] Despite the defendant's concession that the preconstitutional and early constitutional history of article first, § 7, is quite sparse, he contends that the available history nonetheless compels close judicial scrutiny of an issuing judge's probable cause determination. In light of this history, he argues, article first, § 7, must be interpreted to require de novo review of an issuing judge's determination of probable cause. We read the history differently.

"Although cases decided as matters of common law prior to the adoption of the state's first postrevolutionary constitution indicate that independent magisterial review was required before a search warrant could issue; see *Frisbie* v. *Butler,* Kirby (Conn.) 213 (1787), and *Grumon* v. *Raymond,* 1 Conn. 40 (1814); no state statutory or constitutional provision requiring the existence of probable cause for the issuance of warrants existed until Connecticut's citizens adopted the constitution of 1818. See C. Collier, 'The Connecticut Declaration of Rights before the Constitution of 1818: A

---

[10] The text of article first, § 7, was originally adopted as article first, § 8, of the Connecticut constitution of 1818.

Victim of Revolutionary Redefinition,' 15 Conn. L. Rev. 87, 93 n.19 (1982). The declaration of rights adopted in 1818 appears to have its antecedents in the Mississippi constitution of 1817, which in turn derived from the federal bill of rights and the Virginia declaration of rights of 1776. Id., 96–97 n.30. The search and seizure provision in our 1818 constitution, then article first, § 8, closely resembles the fourth amendment to the United States constitution. Although its enumeration was changed to article first, § 7, when the 1965 constitution incorporated article first, § 4, into article seventh, its language has not been altered since its original adoption.

"This court seldom had occasion to construe the search and seizure provision of our constitution prior to the mid-twentieth century. In 1862, this court considered whether then article first, § 8, required an affiant to inform the magistrate issuing the warrant of the underlying facts and circumstances upon which the affiant had concluded that probable cause exists. See *Lowrey* v. *Gridley*, 30 Conn. 450 (1862). This court determined that an affiant's oath that he had 'reason to believe' probable cause existed was sufficient to satisfy our constitution's probable cause requirement, even when the affiant was a prosecutor relying upon 'a secret and confidential communication' from an alleged accomplice. Id., 457–59." *State* v. *Barton*, supra, 538–39 n.4.

Contrary to the defendant's and the dissent's[11] assertion, therefore, the history of article first, § 7, does not

---

[11] The dissent takes us to task for a historical analysis that it claims is "simply wrong." Specifically, the dissent asserts that "[t]he majority relies on the suggestion made in *State* v. *Barton*, 219 Conn. 529, 539 n.4, 594 A.2d 917 (1991), that probable cause was not required for the issuance of a search warrant until after the adoption of the state constitution in 1818." The dissent, however, responds to an argument that we never made.

Nowhere in *Barton*, or in our reliance upon *Barton's* historical analysis, did we claim that the probable cause standard did not exist, as a matter

suggest a requirement of de novo review of an issuing judge's determination that probable cause existed to issue a warrant. Because under article first, § 8, of the constitution an issuing judge could grant an application for a warrant solely on the basis of a prosecutor's oath that probable cause existed; see *Lowrey* v. *Gridley,* supra, 458; a reviewing court would have been unable to review effectively the magistrate's decision.[12]

More recent history also belies the defendant's assertion that our history requires de novo review of an issuing judge's probable cause determination. Prior to 1961,

of common law, prior to 1818. Indeed, our inquiry, as limited by the certified question in this appeal, is simply whether, as a matter of state constitutional law, the defendant is entitled to de novo review of the issuing judge's probable cause determination. Consequently, our reliance on *Barton* is limited to that court's recognition that: (1) although, as a matter of *common law* prior to 1818, independent magisterial review was required before a search warrant could issue, no *statutory* or *constitutional* provision was the source of the probable cause requirement; and (2) our history since the probable cause requirement was adopted as a matter of state constitutional law is exceedingly sparse.

In this regard, therefore, the dissent's lengthy recitation of the common law history of the probable cause standard is of no great significance. In terms of this historical analysis, the crucial question is, given the existence of the constitutional requirement of probable cause, to what degree, if any, does the common law, during the period in which the state constitution was enacted, support the defendant's claim that there was close judicial scrutiny of the issuing judge's probable cause determination. See *State* v. *Joyner,* 225 Conn. 450, 467, 625 A.2d 791 (1993). Consequently, even if there has historically been a common law requirement of probable cause that may have present-day constitutional implications, nothing in the relevant history establishes the procedural consequences that flow from such a requirement. Cf. id. Specifically, the history does not address the question presently before us, namely, whether a trial judge should review de novo a finding of probable cause by a judge who has issued a warrant.

[12] We have, of course, in this century "rejected such conclusory affidavits under both the state and federal constitutions. See, e.g., *State* v. *Heinz,* 193 Conn. 612, 617, 480 A.2d 452 (1984). In *Heinz,* we regarded the fourth amendment and article first, 7, as equally requiring that the warrant application set forth some of the facts on which the affiant relied." *State* v. *Barton,* 219 Conn. 529, 541 n.9, 594 A.2d 917 (1991).

Connecticut courts did not exclude evidence seized in violation of our state constitution.[13] *State* v. *Reynolds,* 101 Conn. 224, 125 A. 636 (1924); see also *State* v. *Carol,* 120 Conn. 573, 181 A. 714 (1935). Consequently, courts had few opportunities in criminal cases to review an issuing judge's probable cause determination. The historical absence from our jurisprudence of the exclusionary rule suggests that, contrary to the defendant's suggestion, careful scrutiny of the warrant process did not exist, because in the usual case there was no need for such review.[14] In light of our review of the constitu-

[13] Until the United States Supreme Court's decision in *Mapp* v. *Ohio,* 367 U.S. 643, 81 S. Ct. 1684, 6 L. Ed. 2d 1081, reh. denied, 368 U.S. 871, 82 S. Ct. 23, 7 L. Ed. 2d 72 (1961), Connecticut courts did not exclude unconstitutionally seized evidence. *State* v. *Mariano,* 152 Conn. 85, 90, 203 A.2d 305 (1964), cert. denied, 380 U.S. 943, 85 S. Ct. 1025, 13 L. Ed. 2d 962 (1965). "The *Mapp* decision abrogated our prior law that relevant evidence, although obtained by unreasonable search and seizure in violation of the federal constitution, was admissible in evidence in our state courts." Id. It was not until our decision in *State* v. *Dukes,* 209 Conn. 98, 115, 547 A.2d 10 (1988), that we concluded that article first, § 7, of the Connecticut constitution requires the exclusion of unconstitutionally seized evidence. We subsequently have refused to interpret our state constitution to include a "good faith" exception to the exclusionary rule. *State* v. *Marsala,* 216 Conn. 150, 151, 579 A.2d 58 (1990).

[14] In fact, historically the sole deterrent to a magistrate's improper issuance of a search warrant appears to have been the common law action of trespass. At common law, both the judge who issued a defective or insufficiently limited warrant and the officer who executed it could be held liable in trespass to the person whose property was searched. *Grumon* v. *Raymond,* 1 Conn. 40, 45–47 (1814). As *Grumon* indicates, a judge who attempted to issue a valid warrant but erred through some oversight or mistake would not be liable for trespass, but a judge who issued a general warrant enjoyed no immunity.

The dissent's reliance on *Grumon* is misplaced. The dissent claims that *Grumon* lends historical support for the defendant's claim that no deference historically was given by the reviewing court to the issuing judge's determination. First, as noted above, the magistrate could be held liable for trespass only if the magistrate had issued a general warrant. Id., 44 (issuing judge is not liable "if he aims at issuing a process which the law recognizes, and fails through some oversight or mistake"). In *Grumon,* the court concluded that the magistrate should be held liable because he issued a general warrant to search for stolen goods, not "supposed to be concealed

tional history, we conclude that neither the plain language of article first, § 7, nor its related history suggests de novo review of an issuing judge's probable cause determination. Indeed, our history of substantial deference to the official who sought a warrant, and our historical absence of an exclusionary rule, point strongly in the direction of the substantial basis scope of review of the issuing judge's determination of probable cause.

## C

Having rejected the defendant's argument under the textual and historical approaches to state constitutional adjudication, we turn to an analysis of federal precedents. As the defendant concedes, those precedents offer no support for his position. The United States Supreme Court has explicitly held that, under the federal constitution, the "substantial basis test" is the appropriate standard by which a court reviewing the

in a particular place, but . . . to search all suspected places, stores, shops and barns in Wilton." Id., 43. Consequently, *Grumon* indicates that the action was of a limited scope and that mere legal error, except for the issuance of a general warrant, in the issuing judge's probable cause determination would not be second guessed.

Moreover, the lengthy passage from *Grumon* cited by the dissent is also unpersuasive. That passage merely recognizes that a party seeking to invoke the jurisdiction of the trial court must allege sufficient threshold facts upon which the court's jurisdiction depended. Id., 47 n.1. That requirement, however, must be understood in the context of what facts must have been presented to a magistrate at that time in order to obtain a search warrant. In *Lowrey* v. *Gridley,* 30 Conn. 450, 458 (1862), this court noted that the proper practice had long been for the affiant to allege simply that he had reason to believe that probable cause existed that the warrant should issue. No specific presentation of the facts necessary to support this belief was necessary to establish the authority of the judge to issue the warrant. Nor was there any independent review of those facts in the context of a criminal case that may have ensued as a result of the search authorized by the warrant. Consequently, we fail to see how the dissent, given the limited scope of this historical requirement, can infer from *Grumon* that careful scrutiny of the judge's decision to issue the warrant existed at that time in our history.

warrant should measure the issuing judge's determination that probable cause existed to issue the warrant. *Massachusetts* v. *Upton,* 466 U.S. 727, 732–33, 104 S. Ct. 2085, 80 L. Ed. 2d 721 (1984). In its per curiam decision in *Massachusetts* v. *Upton,* supra, the court stated: "The [reviewing court] erred in failing to grant any deference to the decision of the Magistrate to issue a warrant. Instead of merely deciding whether the evidence viewed as a whole provided a 'substantial basis' for the Magistrate's finding of probable cause, the court conducted a de novo probable-cause determination. We rejected such after-the-fact, de novo scrutiny in [*Illinois* v. *Gates,* 462 U.S. 213, 236, 103 S. Ct. 2317, 76 L. Ed. 2d 527, reh. denied, 463 U.S. 1237, 104 S. Ct. 33, 77 L. Ed. 2d 1453 (1983)]. 'A grudging or negative attitude by reviewing courts toward warrants,' *United States* v. *Ventresca,* 380 U.S. 102, 108 [85 S. Ct. 741, 13 L. Ed. 2d 684] (1965), is inconsistent both with the desire to encourage use of the warrant process by police officers and with the recognition that once a warrant has been obtained, intrusion upon interests protected by the Fourth Amendment is less severe than otherwise may be the case. . . . A deferential standard of review is appropriate to further the Fourth Amendment's strong preference for searches conducted pursuant to a warrant." See also *Spinelli* v. *United States,* 393 U.S. 410, 418–19, 89 S. Ct. 584, 21 L. Ed. 2d 637 (1969); *Aguilar* v. *Texas,* 378 U.S. 108, 111, 84 S. Ct. 1509, 12 L. Ed. 2d 723 (1964); *Rugendorf* v. *United States,* 376 U.S. 528, 533, 84 S. Ct. 825, 11 L. Ed. 2d 887, reh. denied, 377 U.S. 940, 84 S. Ct. 1330, 12 L. Ed. 2d 303 (1964); *Jones* v. *United States,* 362 U.S. 257, 266, 80 S. Ct. 725, 4 L. Ed. 2d 697 (1960).

D

Similarly, our own precedents demonstrate an unbroken line of authority, from 1965, four years after *Mapp* v. *Ohio,* supra, was decided, through this year,

in favor of the substantial basis test. See, e.g., *State* v. *DeNegris,* 153 Conn. 5, 9, 212 A.2d 894 (1965); *State* v. *Jackson,* 162 Conn. 440, 446, 294 A.2d 517, cert. denied, 409 U.S. 870, 93 S. Ct. 198, 34 L. Ed. 2d 121 (1972); *State* v. *Williams,* 170 Conn 618, 628–29, 368 A.2d 140, cert. denied, 429 U.S. 865, 97 S. Ct. 174, 50 L. Ed. 2d 145 (1976); *State* v. *Couture,* 194 Conn. 530, 536, 482 A.2d 300 (1984), cert. denied, 469 U.S. 1192, 105 S. Ct. 967, 83 L. Ed. 2d 971 (1985); *State* v. *Barton,* supra, 552–53; *State* v. *Johnson,* 219 Conn. 559, 565, 594 A.2d 933 (1991); *State* v. *Rodriguez,* 223 Conn. 127, 135, 613 A.2d 211 (1992); *State* v. *DeFusco,* 224 Conn. 627, 642, 620 A.2d 746 (1993). More particularly, since our adoption of the requirement that state constitutional adjudication rest upon an analysis independent of the federal constitution, we have consistently applied the substantial basis test and, in doing so, have consistently held that "a court reviewing [a] warrant at a subsequent suppression hearing should defer to the reasonable inferences drawn by the magistrate." *State* v. *Barton,* supra, 544–45; *State* v. *Rodriguez,* supra, 135; *State* v. *Johnson,* supra, 563–68.

In addition, our Appellate Court has uniformly applied the substantial basis test. See, e.g., *State* v. *Vincent,* 30 Conn. App. 249, 620 A.2d 152 (1993); *State* v. *Toth,* 29 Conn. App. 843, 618 A.2d 536, cert. denied, 225 Conn. 908, 621 A.2d 291 (1993); *State* v. *Santiago,* 27 Conn. App. 741, 610 A.2d 666, cert. denied, 223 Conn. 906, 610 A.2d 179 (1992); *State* v. *Rodriguez,* 27 Conn. App. 307, 606 A.2d 22 (1992); *State* v. *Anziano,* 26 Conn. App. 667, 603 A.2d 415 (1992); *State* v. *Castana,* 25 Conn. App. 99, 592 A.2d 977 (1991).

E

We turn next to the precedents of our sibling states. The defendant concedes that no jurisdiction has concluded that, pursuant to its state constitution, a crimi-

nal defendant is entitled to de novo review of the issuing judge's probable cause determination. Although we have been unable to find any case of another jurisdiction that has explicitly rejected the de novo review approach, the courts of almost every other state have applied the substantial basis scope of review. See *State v. Jones,* 706 P.2d 317 (Alaska 1985) (engaging in deferential review despite retaining the more restrictive *Aguilar-Spinelli* test); *Rainwater v. State,* 302 Ark. 492, 791 S.W.2d 688 (1990); *People v. Camarella,* 54 Cal. 3d 592, 818 P.2d 63, 286 Cal. Rptr. 780 (1991); *People v. Turcotte-Schaeffer,* 843 P.2d 658 (Colo. 1993); *Schmitt v. State,* 590 So. 2d 404 (Fla. 1991), cert. denied, U.S. , 112 S. Ct. 1572, 118 L. Ed. 2d 216 (1992); *State v. Stephens,* 252 Ga. 181, 311 S.E.2d 823 (1984); *State v. Austria,* 55 Haw. 565, 524 P.2d 290 (1974); *State v. Lang,* 105 Idaho 683, 672 P.2d 561 (1983); *People v. Tisler,* 103 Ill. 2d 226, 469 N.E.2d 147 (1984); *Mers v. State,* 482 N.E.2d 778 (Ind. App. 1985); *State v. Luter,* 346 N.W.2d 802 (Iowa), cert. denied, 469 U.S. 830, 105 S. Ct. 116, 83 L. Ed. 2d 59 (1984); *State v. Abu-Isba,* 235 Kan. 851, 685 P.2d 856 (1984); *Beemer v. Commonwealth,* 665 S.W.2d 912 (Ky. 1984); *State v. Manso,* 449 So. 2d 480 (La.), cert. denied, 469 U.S. 835, 105 S. Ct. 129, 83 L. Ed. 2d 70 (1984); *Birchead v. State,* 317 Md. 691, 566 A.2d 488 (1989); *Commonwealth v. Jean-Charles,* 398 Mass. 752, 500 N.E.2d 1332 (1986); *People v. Russo,* 439 Mich. 584, 487 N.W.2d 698 (1992); *State v. McCloskey,* 453 N.W.2d 700 (Minn. 1990); *Lee v. State,* 435 So. 2d 674 (Miss. 1983); *State v. Gardner,* 741 S.W.2d 1 (Mo. 1987), cert. denied, 486 U.S. 1025, 108 S. Ct. 2001, 100 L. Ed. 2d 232 (1988); *State v. Kelly,* 205 Mont. 417, 668 P.2d 1032 (1983); *State v. Vermuele,* 234 Neb. 973, 453 N.W.2d 441 (1990); *State v. Jaroma,* 128 N.H. 423, 514 A.2d 1274 (1986); *State v. Novembrino,* 105 N.J. 95, 519 A.2d 820 (1987); *State v. Cordova,* 109 N.M. 211, 784 P.2d

30 (1989) (engaging in deferential review despite retaining the more restrictive *Aguilar-Spinelli* test); *State v. Garner,* 331 N.C. 491, 417 S.E.2d 502 (1992); *State v. Ennen,* 496 N.W.2d 46 (N.D. 1993); *State v. George,* 45 Ohio St. 3d 325, 544 N.E.2d 640 (1989); *Langham v. State,* 787 P.2d 1279 (Okla. Crim. App. 1990); *Commonwealth v. Gray,* 509 Pa. 476, 503 A.2d 921 (1985); *State v. Ricci,* 472 A.2d 291 (R.I. 1984) (engaging in deferential review despite retaining the more restrictive *Aguilar-Spinelli* test); *State v. Adams,* 291 S.C. 132, 352 S.E.2d 483 (1987); *State v. O'Connor,* 378 N.W.2d 248 (S.D. 1985); *State v. Ballard,* 836 S.W.2d 560 (Tenn. 1992); *Hennessy v. State,* 660 S.W.2d 87 (Tex. Crim. App. 1983); *State v. Anderson,* 701 P.2d 1099 (Utah 1985); *State v. Jackson,* 102 Wash. 2d 432, 688 P.2d 136 (1984); *State v. Hlavacek,* 185 W. Va. 371, 407 S.E.2d 375 (1991); *State v. Anderson,* 138 Wis. 2d 451, 406 N.W.2d 398 (1987); *Bland v. State,* 803 P.2d 856 (Wyo. 1990).

F

We turn now to the final analytical tool of our state constitutional jurisprudence: what we have characterized as resort to "economical/sociological considerations." *State v. Geisler,* supra, 685. In effect, this factor directs our attention to considerations of public policy. It requires us, in the context of this case, to determine whether de novo review of an issuing judge's probable cause determination is, as a matter of sound constitutional policy, required to guarantee the people of Connecticut "the full panoply of rights [that they] have come to expect as their due." *Horton v. Meskill,* 172 Conn. 615, 642, 376 A.2d 359 (1977). The purpose and principles underlying article first, § 7, lead us to conclude, consistent with our constitutional history, with federal precedents, with our own precedents, and with the precedents of other states, that de novo review is

not constitutionally required, and that it would, in fact, disserve the constitutional guarantees of article first, § 7.

The principal requirement of article first, § 7, is that no warrant shall issue but upon probable cause. "Probable cause, broadly defined, compromises such facts as would reasonably persuade an impartial and reasonable mind not merely to suspect or conjecture, but to believe that criminal activity has occurred." (Internal quotation marks omitted.) *State* v. *Barton,* supra, 548. The probable cause determination is, simply, an analysis of probabilities. *Brinegar* v. *United States,* 338 U.S. 160, 175, 69 S. Ct. 1302, 93 L. Ed. 1879, reh. denied, 338 U.S. 839, 70 S. Ct. 31, 94 L. Ed. 513 (1949). The determination is not a technical one, but is informed by "the factual and practical considerations of everyday life on which reasonable and prudent [persons], not legal technicians, act." Id. Probable cause is "not readily, or even usefully, reduced to a neat set of legal rules." *Illinois* v. *Gates,* supra, 232. Reasonable minds may disagree as to whether a particular affidavit establishes probable cause. *United States* v. *Leon,* 468 U.S. 897, 914, 104 S. Ct. 3405, 82 L. Ed. 2d 677, reh. denied, 468 U.S. 1250, 105 S. Ct. 52, 82 L. Ed. 2d 942 (1984).

The probable cause determination has been delegated in Connecticut to a judge of the Superior Court. General Statutes § 54-33a. " 'In making this determination, the magistrate is entitled to draw reasonable inferences from the facts presented.' " *State* v. *Rodriguez,* supra, 223 Conn. 135. We have held that the decision to draw or not to draw a given inference from the facts contained in the affidavit lies within the discretion of the judge to whom the application is presented. *State* v. *Barton,* supra, 543. The only constitutional limitation on this discretion is that any inference drawn from the facts presented in the warrant must be reasonable.

The defendant claims nonetheless that he is entitled to de novo review by the trial court of the issuing judge's probable cause determination. Specifically, he argues that because the original probable cause determination is made ex parte, rather than in an adversary setting, such as a hearing on a motion to suppress, de novo review is best suited to guarantee that the constitutional standard of probable cause was met.

The defendant's claim is unpersuasive for several reasons. First, as we have made clear above, under either the substantial basis test or de novo review, the reviewing court is required to invalidate the warrant if the issuing judge, in order to reach a conclusion that probable cause existed, drew an *unreasonable* material inference from the facts presented in the affidavit. See, e.g., *State* v. *Duntz,* 223 Conn. 207, 218, 613 A.2d 224 (1992). Consequently, the defendant's argument is nothing more than a claim that he is entitled to have the trial court, ruling on his motion to suppress, substitute its judgment as to whether to draw certain reasonable inferences from the affidavit for the reasonable inferences drawn by the issuing judge who found probable cause.

For example, in the present case, the affidavit did not explicitly provide information that clearly demonstrated that cocaine was kept at 36 Clinton Avenue. Consequently, in order to find probable cause to issue the warrant to search the defendant's residence, the issuing judge necessarily had to infer from those facts provided in the warrant that cocaine would be found at 36 Clinton Avenue.[15] We have already determined,

---

[15] In this connection, the defendant also argues that de novo review is constitutionally required because the issuing judge is not obligated to articulate the reasons supporting his or her conclusion that probable cause existed. Consequently, he argues, meaningful review is impossible.

We disagree that the lack of an articulation requirement supports the defendant's claim for de novo review. As a practical matter, a reviewing

for the purposes of this appeal, that this inference was reasonable. Relying on that scenario, therefore, the issuing judge reasonably determined that probable cause existed. The trial court, however, presumably after engaging in a de novo review, concluded that probable cause did not exist because it declined to draw the same inference that had been drawn by the issuing judge.

The defendant's argument assumes that reasonable inferences drawn by the issuing judge in an ex parte setting are less reliable than those drawn, or not drawn, by the reviewing court, and are therefore constitutionally suspect. We do not share that assumption. Although an adversary hearing is held on a motion to suppress, no new evidence is ordinarily introduced and the focus is on whether probable cause is established within the four corners of the affidavit.[16] Consequently, the prin-

court, properly employing the substantial basis test, simply examines the affidavit for the explicitly stated facts establishing probable cause. Often, these facts, by themselves, will support the determination that probable cause in fact exists. On other occasions, however, in which such facts by themselves are not adequate, the reviewing court will then determine what inferences from the facts stated in the affidavit must have necessarily been drawn in order for the issuing judge to have concluded that probable cause existed. The reviewing court then must determine whether those inferences are reasonable. The process of deciding whether certain inferences, drawn to support an ultimate factual determination, are reasonable is a process with which courts are quite familiar. See, e.g., *State* v. *Duntz*, 223 Conn. 207, 220–21, 613 A.2d 224 (1992). Consequently, a reviewing court is able, without any explicit requirement of articulation, to test the propriety of the issuing judge's probable cause determination.

[16] Although a hearing on a motion to suppress is conducted as an adversary proceeding, ordinarily the hearing is limited to the parties' legal arguments as to whether the affidavit accompanying the warrant application established probable cause. A defendant, however, may be able to offer evidence that the information contained in the affidavit is false or misleading, or that there is a material omission from the affidavit. See *Franks* v. *Delaware*, 438 U.S. 154, 98 S. Ct. 2674, 57 L. Ed. 2d 667 (1978). If a defendant "makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement

cipal difference between the issuing judge's determination and the determination made by a reviewing court pursuant to a motion to suppress, according to the defendant's claim, would be that the judge presiding at the motion to suppress hears arguments from the defendant's attorney as to why certain inferences, even though they may be reasonable, should not be drawn. We disagree with the defendant that this difference is of such significance as to conclude that, without such arguments, de novo review of that ex parte decision is constitutionally required.

Furthermore, we do not believe that, as the defendant's argument suggests, issuing judges in Connecticut fail to take seriously their constitutional obligations to consider carefully the sufficiency of the affidavit supporting warrant applications.[17] As noted above, war-

is necessary to the finding of probable cause, the Fourth Amendment requires that [an evidentiary] hearing be held at the defendant's request." Id., 155–56.

In the absence of such a showing, the hearing on the motion to suppress is limited to the four corners of the affidavit. This limitation, however, applies to an appellate court reviewing the same warrant application. Consequently, the defendant's claim that de novo review is required logically applies both to the trial court and to any appellate court. Thus, under the scenario posited by the defendant, and endorsed by the dissent, an appellate court would be free to substitute *its* reasonably drawn inferences for those inferences *reasonably drawn by the reviewing trial court*—all this, no less, within the same four corners of the same affidavit. We fail to see, however, what basis an appellate court would have for such a substitution of reasonable inferences.

[17] The dissent asserts that de novo review is required because: (1) the issuing judge does not have the benefit of an adversary hearing; (2) the application is usually presented by the police, sometimes at the judge's home at night; (3) the judge usually does not have time to study and reflect on it; (4) the matter is often an emergency; (5) the police are not obligated to advise the judge whether their application has been denied by another judge; (6) search warrants are generally neither initiated nor reviewed by the state's attorney; and (7) warrant applications are prepared by police officers who lack law degrees. Some of these assertions simply lack a sub-

rants are issued by judges of the Superior Court who have both legal training and experience as triers of fact. Moreover, our decision in *State* v. *Marsala,* supra, in which we concluded that article first, § 7, does not contain a good faith exception to the exclusionary rule, has created an important incentive for issuing judges to scrutinize warrant applications closely because the significant cost of an error will be exclusion of the evidence seized pursuant to the warrant. This important incentive helps to ensure that the issuing judge's ex parte probable cause determination, based upon reasonably drawn inferences, will be sufficiently reliable so as to be entitled to the normal deference a reviewing court ordinarily gives to judicial factual findings.

Although we recognize that de novo review performed in the adversarial setting of a hearing on a motion to suppress may have some incremental value in deciding whether the affidavit establishes probable cause,[18] we conclude that it is far outweighed by the

stantial factual basis. Others are simply irrelevant, given the premise of this case that the inference drawn by the issuing judge was reasonable.

Ultimately, however, despite the dissent's disclaimer, these assertions simply betray a mistrust of the ability of the issuing judges to perform their judicial obligation to require, before signing the warrant, that the supporting affidavit, including the inferences reasonably drawn therefrom, establish probable cause, because the net effect of the dissent's position is merely to substitute the inferences drawn by the reviewing court for the reasonable inferences drawn by the issuing judge. Thus, the dissent's reliance on the truism that we all make mistakes is beside the point. If the inference drawn by the issuing judge is reasonable, we fail to see what "mistake" the issuing judge may have committed. We therefore do not share the dissent's mistrust of the warrant issuing process.

[18] Of course, the reliability of any factual determination made in the course of the judicial process may arguably be enhanced by permitting argument on it first. That is one reason why we ordinarily permit final argument to the court after the close of evidence in a court trial or in any other proceeding in which the court must make factual findings, including drawing inferences from the evidence. That does not mean, however, that permitting reasonable inferences, drawn in the necessarily ex parte setting of the warrant-issuing process, is, ipso facto, unreliable or constitutionally suspect.

costs it would impose on the important values underlying the warrant issuing process. To permit a substitution of the reviewing court's factual inferences for those drawn by the issuing judge would seriously undermine the sound policy reasons underlying a reviewing court's traditional deference to the issuing judge's probable cause determination. Article first, § 7, has long been interpreted as creating a constitutional preference for warrants. See, e.g., *State* v. *Duntz,* supra, 216; *State* v. *Johnson,* 219 Conn. 559, 565, 594 A.2d 933 (1991); *State* v. *Morrill,* 205 Conn. 560, 565, 534 A.2d 1165 (1987). " 'In a doubtful or marginal case . . . our constitutional preference for a judicial determination of probable cause leads us to afford deference to the [issuing judge's] determination.' " *State* v. *Duntz,* supra; see also *Johnson* v. *United States,* 333 U.S. 10, 13–14, 68 S. Ct. 367, 92 L. Ed. 436 (1948) ("The point of the Fourth Amendment, which often is not grasped by zealous officers, is not that it denies law enforcement the support of the usual inferences which reasonable men draw from evidence. Its protection consists in requiring that those inferences be drawn by a neutral and detached magistrate instead of being judged by the officer engaged in the often competitive enterprise of ferreting out crime.").

The underlying justification for this deference, as stated by the United States Supreme Court, is that a " 'grudging or negative attitude by reviewing courts toward warrants,' *United States* v. *Ventresca,* 380 U.S. 102, 108, 85 S. Ct. 741, 13 L. Ed. 2d 684 (1965), is inconsistent both with the desire to encourage use of the warrant process by police officers and with the recognition that once a warrant has been obtained, intrusion upon interests protected by the Fourth Amendment is less severe than otherwise may be the case. . . . A deferential standard of review is appropriate to further the

Fourth Amendment's strong preference for searches conducted pursuant to a warrant." *Massachusetts* v. *Upton,* supra, 733.

It would be inconsistent with this justification, and with the important policies it expresses, to permit the affidavit submitted by the affiants to be subjected to the type of review that the defendant claims is required. To substitute de novo review for the substantial basis test would create the risk that "police might well resort to warrantless searches, with the hope of relying on consent or some other exception to the Warrant Clause that might develop at the time of the search. In addition, the possession of a warrant by police officers conducting an arrest or search greatly reduces the perception of unlawful or intrusive police conduct, by assuring the individual whose property is searched or seized of the lawful authority of the executing officer, his need to search, and the limits of his power to search." (Internal quotation marks omitted.) *Illinois* v. *Gates,* supra, 236.

A deferential standard of review, moreover, which accords the appropriate respect for the reasonable inferences drawn by the issuing judge, furthers our constitution's strong preference for searches conducted pursuant to a warrant. *State* v. *Duntz,* supra. It encourages use of the warrant process by the police, conveying to them the important message that warrants, upon which they have relied, will not be invalidated by a second judge simply because that judge declines to draw the same reasonable inferences drawn by the issuing judge. Finally, it recognizes that, once a warrant has been secured, intrusion upon an individual's privacy and possessory interest is less severe than is otherwise the case. These policies are furthered by the substantial basis test and undermined by a requirement of de novo review. Indeed, if the "substantial

basis" test means anything, it means that the reviewing court should give deference to the reasonable inferences drawn by the issuing judge.

In sum, the relevant criteria—our own constitutional history, the precedents of this court and the Appellate Court, federal precedent, the decisions of our sibling states, and sound policy reasons—strongly support the "substantial basis" scope of review and point away from the requirement of de novo review. In light of these constitutional principles, we conclude that article first, § 7, does not require de novo review of the issuing judge's probable cause determination and that the "substantial basis" test is better suited to preserve the liberties guaranteed by that provision.

The judgment of the Appellate Court is affirmed.

In this opinion PETERS, C. J., and CALLAHAN, J., concurred.

BERDON, J., with whom KATZ, J., joins, dissenting. The question before the court today, which to my knowledge has never before been raised, is one of great importance to our right to privacy—that is, the right of our citizens to be free from unwarranted governmental intrusions into their homes and personal lives. The issue is whether the trial court must make a de novo review of an issuing judge's (hereinafter magistrate) determination that probable cause exists to issue a search warrant. I believe that both General Statutes § 54-33f[1]

---

[1] General Statutes § 54-33f provides: "MOTION FOR RETURN OF UNLAWFULLY SEIZED PROPERTY AND SUPPRESSION AS EVIDENCE. (a) A person aggrieved by search and seizure may move the court which has jurisdiction of his case or, if such jurisdiction has not yet been invoked, then the court which issued the warrant, or the court in which his case is pending, for the return of the property and to suppress for use as evidence anything so obtained on the ground that: (1) The property was seized without a warrant, or (2) the warrant is insufficient on its face, or (3) the property seized is not that described in the warrant, or (4) there was not probable cause

and article first, § 7, of the state constitution[2] require such a review.

Let me first put the issue in this case in its proper context. The police had overwhelming evidence that the defendant, Ruben Diaz, was a drug dealer. The problem with the warrant, as the trial court correctly found, is that the supporting affidavit does not contain any facts indicating it was probable that drugs were located at the defendant's home, 36 Clinton Avenue in Old Saybrook, the target of the search. The affidavit clearly furnishes probable cause to believe that drugs were located at 34 Clinton Avenue, the home next door to that of the defendant. It is impossible to know whether the magistrate drew an inference that drugs were located at the defendant's home because, as is the case with every warrant, there is no record of his findings and conclusions. For all we know, the magistrate may have mistakenly believed that some or all of the facts supporting probable cause to search 34 Clinton Avenue were applicable to 36 Clinton Avenue. We do know, however, what the trial court concluded after reviewing the warrant and affidavit at the hearing on the defendant's motion to suppress. The trial court found that the affidavit failed to support probable cause

for believing the existence of the grounds on which the warrant was issued, or (5) the warrant was illegally executed. In no case may the judge who signed the warrant preside at the hearing on the motion.

"(b) The motion shall be made before trial or hearing unless opportunity therefor did not exist or the defendant was not aware of the grounds for the motion, but the court in its discretion may entertain the motion at the trial or hearing.

"(c) The court shall receive evidence on any issue of fact necessary to the decision of the motion. If the motion is granted, the property shall be restored unless otherwise subject to lawful detention and it shall not be admissible in evidence at any hearing or trial."

[2] Article first, § 7, of the Connecticut constitution provides: "The people shall be secure in their persons, houses, papers and possessions from unreasonable searches or seizures; and no warrant to search any place, or to seize any person or things, shall issue without describing them as nearly as may be, nor without probable cause supported by oath or affirmation."

to believe that narcotics would be found at the defendant's home, 36 Clinton Avenue.[3]

We all recognize that drug trafficking is having a devastating effect on our society. But the crime rate may not be used as a barometer to determine the degree to which privacy rights should be enforced. When we diminish the rights of criminals, we do the same for law abiding citizens. Upholding the constitutional and statutory rights of all, rather than upholding them for some and compromising them for others, is the difference between a democracy and a police state. I believe that what Justice Brennan said about the fourth amendment in *Illinois* v. *Gates*, 462 U.S. 213, 290, 103 S. Ct. 2317, 76 L. Ed. 2d 527, reh. denied, 463 U.S. 1237, 104 S. Ct. 33, 77 L. Ed. 2d 1453 (1983), is equally pertinent to the issues before us today: "Rights secured by the Fourth Amendment are particularly difficult to protect because their advocates are usually criminals. . . . But the rules we fashion [are] for the innocent and guilty alike." (Citation omitted; internal quotation marks omitted.)

The right of our citizens to be free from unreasonable searches is fundamental[4] and is firmly embedded

---

[3] The trial court stated: "[W]hat you have to conclude [from the affidavit] is that the drugs were kept at 34 [Clinton Avenue] and the purchases took place at 36 [Clinton Avenue] and the drugs were then brought over from 34 [Clinton Avenue] . . . you can't reasonably believe from this warrant that the drugs were kept at 36 [Clinton Avenue]."

[4] Justice Jackson underscored the importance of the right to be free from governmental intrusion when he wrote that these rights "belong in the catalog of indispensable freedoms. Among deprivations of rights, none is so effective in cowing a population, crushing the spirit of the individual and putting terror in every heart. Uncontrolled search and seizure is one of the first and most effective weapons in the arsenal of every arbitrary government. . . . But the right to be secure against searches and seizures is one of the most difficult to protect. Since the officers are themselves the chief invaders, there is no enforcement outside of court." *Brinegar* v. *United States,* 338 U.S. 160, 180–81, 69 S. Ct. 1302, 93 L. Ed. 1879 (Jackson, J., dissenting), reh. denied, 338 U.S. 839, 70 S. Ct. 31, 94 L. Ed. 513 (1949).

in article first, § 7, of our state constitution. Just last year, we underscored the importance of the right to privacy in one's home when we rejected federal precedent and held, under our state constitution, that "evidence derived from an unlawful warrantless entry into the home [must] be excluded unless the taint of the illegal entry is attenuated by the passage of time or intervening circumstances." *State* v. *Geisler,* 222 Conn. 672, 690, 610 A.2d 1225 (1992). We stressed that "[t]he sanctity of the home has a well established place in our jurisprudence. The English common law, upon which much of this country's constitutional and common law is based, recognized that intrusion into the home constituted especially egregious conduct." Id., 687.[5] Further, "the right to be secure in one's home, 'unequivocally establishes the proposition that [a]t the very core [of the Fourth Amendment] stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion. *Silverman* v. *United States,* 365 U.S. 505, 511 [81 S. Ct. 679, 5

[5] " 'From earliest days, the common law drastically limited the authority of law officers to break the door of a house to effect an arrest. Such action invades the precious interest of privacy summed up in the ancient adage that a man's house is his castle. As early as the 13th Yearbook of Edward IV (1461–1483), at folio 9, there is a recorded holding that it was unlawful for the sheriff to break the doors of a man's house to arrest him in a civil suit in debt or trespass, for the arrest was then only for the private interest of a party. Remarks attributed to William Pitt, Earl of Chatham, on the occasion of debate in Parliament on the searches incident to the enforcement of an excise on cider, eloquently expressed the principle: "The poorest man may in his cottage bid defiance to all the forces of the crown. It may be frail; its roof may shake; the wind may blow through it; the storm may enter; the rain may enter; but the King of England cannot enter—all his force dares not cross the threshold of the ruined tenement!" ' *Miller* v. *United States,* 357 U.S. 301, 306–307, 78 S. Ct. 1190, 2 L. Ed. 2d 1332 (1958). In discussing burglary, defined as 'nocturnal house-breaking,' Blackstone wrote, '[a]nd the law of England has so particular and tender a regard to the immunity of a man's house, that it styles it his castle, and will never suffer it to be violated with impunity . . . .' 4 Blackstone's Commentaries (1822) p. 222." *State* v. *Geisler,* 222 Conn. 672, 687–88, 610 A.2d 1225 (1992).

L. Ed. 2d 734 (1961)]. *Payton* v. *New York,* [445 U.S. 573, 589–90, 100 S. Ct. 1371, 63 L. Ed. 2d 639 (1980)]. The right of officers to thrust themselves into a home is . . . a grave concern, not only to the individual but to a society which chooses to dwell in reasonable security and freedom from surveillance. *Johnson* v. *United States,* 333 U.S. 10, 14, 68 S. Ct. 367, 92 L. Ed. 436 (1948).' (Internal quotation marks omitted.) *State* v. *Brosnan,* 221 Conn. 788, 806–807, 608 A.2d 49 (1992)." *State* v. *Geisler,* supra, 689–90.

I

Before beginning my analysis of the statutory and constitutional provisions that I believe require de novo review by the trial court, I want to address what appears to be the majority's chief concern—that is, that de novo review will somehow discourage the police from seeking warrants and encourage them to resort to warrantless searches instead. This argument was implicitly rejected when a unanimous, en banc court rejected the "good faith" exception to the exclusionary rule in *State* v. *Marsala,* 216 Conn. 150, 579 A.2d 58 (1990). The "good faith" exception clearly encourages the police to obtain a warrant, since it effectively insulates anything but an obviously invalid warrant from later review. Cf. *State* v. *Guzman,* 122 Idaho 981, 997, 842 P.2d 660 (1992). The warrant preference, however, was not mentioned in *Marsala.* In fact, *Marsala* stressed that police conduct is not the only factor to consider in determining what is required by article first, § 7. The effect on magistrates must be considered as well. *State* v. *Marsala,* supra, 167–69.

But more to the point, the majority's argument that the so-called "warrant preference" justifies deferential review of a magistrate's probable cause determination does not make sense. Whenever a defendant seeks to suppress evidence obtained from a search, the

state is always in a better position if the officers conducting the search had a warrant. Warrantless searches are per se unreasonable. *State* v. *Lewis,* 220 Conn. 602, 609, 600 A.2d 1330 (1991). If the defendant moves to suppress evidence obtained from a warrantless search, the burden is on the state to prove the existence of an exception to the warrant requirement. *State* v. *Copeland,* 205 Conn. 201, 209–10, 530 A.2d 603 (1987); *State* v. *Badgett,* 200 Conn. 412, 424, 512 A.2d 160, cert. denied, 479 U.S. 940, 107 S. Ct. 423, 93 L. Ed. 2d 373 (1986). In contrast, if the defendant moves to suppress evidence obtained pursuant to a search warrant, the defendant bears the burden of proving that the search was illegal. *State* v. *Williams,* 169 Conn. 322, 330, 363 A.2d 72 (1975); *State* v. *Mariano,* 152 Conn. 85, 91, 203 A.2d 305 (1964), cert. denied, 380 U.S. 943, 85 S. Ct. 1025, 13 L. Ed. 2d 962 (1965). In view of the much heavier burden borne by warrantless searches, it is unreasonable to believe that the police will be discouraged from obtaining warrants if the standard of review on appeal is made less deferential.

Furthermore, there are other practical reasons that compel de novo review. The magistrate, by necessity, makes an ex parte determination of probable cause. He or she does not have the benefit of an adversarial hearing during which the issues are forged in hot controversy. Rather, the application for the warrant is usually presented by the police to the magistrate, sometimes at the latter's home in the dead of the night. The magistrate usually does not have time to study and reflect upon the warrant. More likely than not, the need for the warrant involves an emergency. Nor are the police obligated to advise the magistrate if their application has been denied by another magistrate. And, unlike an arrest warrant,[6] a search warrant is generally neither

---

[6] See Practice Book § 593.

initiated nor reviewed by the state's attorney, who is professionally obligated to "[r]efrain from prosecuting a charge that [he or she] knows is not supported by probable cause." Rules of Professional Conduct 3.8 (a). Instead, search warrants are generally prepared and submitted by police officers who may have some training, but not law degrees.

Moreover, as a practical matter, there is no need to give deference to the magistrate. The reviewing court has before it the same evidence that is before the magistrate—an affidavit. Credibility and demeanor are not at issue; the magistrate does not, by virtue of being the first to review the warrant, have any of the *advantages* that usually compel reviewing courts to give deference to the lower court. There is, however, an important difference that favors de novo review: at a suppression hearing, the trial court has the *advantage* over the magistrate of being able to make a decision without the pressure of the circumstances and with the help of advocates.

Finally, the issuing magistrate does not make factual findings in order to facilitate judicial review. If a de novo review were made by the trial court, we would have a record to review on appeal and would not have to hypothesize about what inferences the magistrate may have drawn. This record would protect the constitutional right to be free from unreasonable searches and seizures.[7]

This cost/benefit analysis leads to the inescapable conclusion that there are overwhelming disadvantages to deferential review under the "substantial basis" test

[7] The majority suggests that my analysis would require there to be de novo review at the appellate court level as well. To the contrary, because the trial court's de novo review would be performed in an adversarial setting and would furnish a record, an appellate court could properly give deference to the trial court.

of *Illinois* v. *Gates,* supra. Indeed, deferential review necessarily erodes the exclusionary rule, which is the only tool we have for effectively enforcing the right to be free from unreasonable searches and seizures. De novo review would require the decision as to whether probable cause existed to conduct a search to be made in an adversarial setting with time for careful consideration and reflection by the judge.[8]

## II

The defendant first argues that General Statutes § 54-33f statutorily mandates de novo review. We have long held, and the cases are numerous, "that if a statute is clear and unambiguous, there is no room for construction." *Murray* v. *Lopes,* 205 Conn. 27, 33, 529 A.2d 1302 (1987); see also *State* v. *Milardo,* 224 Conn. 397, 419, 618 A.2d 1347 (1993); *State* v. *Cain,* 223 Conn. 731, 744, 613 A.2d 804 (1992). Section 54-33f is clear and unambiguous. Subsection (a) provides, in relevant part, that a "person aggrieved by search and seizure may move the court . . . for the return of the property and to suppress for use as evidence anything so obtained on the ground that . . . (4) there was not probable cause for believing the existence of the grounds on which the warrant was issued . . . . In no case may the judge who signed the warrant preside at the hearing on the motion." This statute has never been reviewed by this court or the Appellate Court on the precise issue presented: whether a trial court considering a motion to suppress should give deference to the magistrate or must instead review the supporting affidavit de novo. As I read the statute, the trial judge who reviews the warrant on a motion to suppress must

---

[8] Indeed, even the majority concedes that "de novo review performed in the adversarial setting of a hearing on a motion to suppress may have some incremental value in deciding whether the affidavit establishes probable cause . . . ."

himself or herself determine whether there is probable cause, and that determination must be made by him or her without deference to the magistrate's conclusions. Even if this intent were not perfectly clear from the language of subdivision (4) alone, the remainder of the statute makes it crystal clear by directing that the review must be performed by a judge other than the one who issued the warrant.

The majority dismisses § 54-33f by saying that it is merely procedural. The opinion predicates this on two cases, *State* v. *Brown,* 14 Conn. App. 605, 543 A.2d 750, cert. denied, 208 Conn. 816, 546 A.2d 283 (1988),[9] and *State* v. *Marsala,* supra. *Marsala* placed this label on § 54-33f in the context of considering whether, in Connecticut, the exclusionary rule was limited by a "good faith" exception. *Marsala* held that § 54-33f is "procedural rather than substantive and, therefore, do[es] not define the extent of the exclusionary rule under Connecticut law." Id., 157.[10]

The problem with the majority's dismissal of § 54-33f by labeling it "procedural" is that the issue we have before us today is a procedural issue—that is, how the trial court should go about determining whether evidence seized pursuant to a warrant should be sup-

[9] *State* v. *Brown,* 14 Conn. App. 605, 543 A.2d 750, cert. denied, 208 Conn. 816, 546 A.2d 283 (1988), embraced the "good faith" exception to the exclusionary rule. Of course, *Brown* was effectively overruled two years later by *State* v. *Marsala,* 216 Conn. 150, 579 A.2d 58 (1990), in which this court rejected this exception as being incompatible with our state constitution.

[10] The majority opinion cites *State* v. *Marsala,* 216 Conn. 150, 579 A.2d 58 (1990), for the proposition that General Statutes § 54-33f "was enacted merely to set forth the appropriate procedural mechanism by which to bring a motion to suppress." This is misleading because the *Marsala* court never considered the procedural scope of the statute. *Marsala* held that § 54-33f was *procedural* and therefore did not create new *substantive* rights for criminal defendants. Unlike in *Marsala,* the issue before the court today is procedural—the procedural right to de novo review.

pressed.[11] Procedural law is that "which prescribes [the] method of enforcing rights or obtaining redress for their invasion"; it is the "machinery for carrying on procedural aspects of [a] civil or criminal action. . . . As a general rule, laws . . . which merely prescribe the manner in which [substantive] rights and responsibilities may be exercised and enforced in court are 'procedural laws.' " (Citations omitted.) Black's Law Dictionary (6th Ed. 1990). In *Clisham* v. *Board of Police Commissioners*, 223 Conn. 354, 370, 613 A.2d 254 (1992), we specifically recognized that the question of what standard of review should be used is a procedural issue.[12]

The state argues that we should determine the legislature's intent and construe § 54-33f accordingly. As indicated above, such statutory construction is not appropriate when the language of the statute is plain and unambiguous. And, even if it were appropriate, I would come to the same conclusion. As we recognized in *State* v. *Marsala,* supra, 157, § 54-33f was enacted in response to *Mapp* v. *Ohio,* 367 U.S. 643, 81 S. Ct. 1684, 6 L. Ed. 2d 1081 (1961), which made the fourth amendment's exclusionary rule applicable to the states through the fourteenth amendment. The statute prescribes the manner in which the defendant's right to suppression of unreasonably obtained evidence is to

[11] The majority apparently concedes that this issue is procedural. In the last paragraph of footnote 11 of its opinion, the majority characterizes the issue before us as whether de novo review is one of the "procedural consequences" that flows from the substantive probable cause requirement.

[12] In reviewing a trial court's conclusion that the plaintiff had not met his burden of proving that a member of the administrative board that dismissed him had prejudged the case, we stated: "In addressing the sufficiency of the evidence adduced by the plaintiff, we confront both a procedural and a substantive question. Procedurally, what is the appropriate standard of review of the determination of the trial court concluding that the evidence was insufficient? Substantively, what should our conclusion be?" *Clisham* v. *Board of Police Commissioners,* 223 Conn. 354, 370, 613 A.2d 254 (1992).

be implemented in Connecticut. It clearly and simply directs the *trial court* to determine whether there was probable cause to search; it does not direct the trial court to review the magistrate's determination of this issue. There is nothing in the legislative history to refute the plain meaning of the statute.

Secondly, the state argues that construing § 54-33f to contain a de novo review requirement would place the statute in constitutional jeopardy on the ground it violates the doctrine of separation of powers. The state relies on the three-to-two decision in *State* v. *Clemente,* 166 Conn. 501, 516, 353 A.2d 723 (1974), that a statute dealing with discovery in criminal cases was unconstitutional. *Clemente,* however, was finally put to rest by our decision in *Bartholomew* v. *Schweizer,* 217 Conn. 671, 587 A.2d 1014 (1991). In *Bartholomew,* we upheld the constitutionality of a statute that permitted counsel in personal injury cases to suggest to the jury an appropriate monetary amount during closing argument. Id., 683. We made it clear that "legislative and judicial powers frequently overlap . . . [and] the doctrine of the separation of powers cannot be applied rigidly." Id., 676. In other words, it is clear that judicial procedural matters implicate a shared power, and as long as the legislature does not interfere with the performance of our judicial functions, statutorily created court procedures will pass constitutional muster.

I agree with the defendant that § 54-33f clearly and unambiguously requires de novo review by the trial court, and that it was within the legislature's power to so require.

### III

Since I believe that the legislature in enacting § 54-33f clearly mandated de novo review by the trial court, I would not normally reach the state constitu-

tional issue. Nevertheless, because the majority reaches this issue and, I believe, decides it incorrectly, I shall discuss it as well. After an analysis of our state history, common law precedents and economic/sociological considerations; see *State* v. *Geisler,* supra, 685; I conclude that article first, § 7, of the Connecticut constitution requires de novo review by the trial court.

Our state has a long history of supporting the right to be free from unwarranted governmental intrusions. In the 1787 case of *Frisbie* v. *Butler,* Kirby (Conn.) 213, 215 (1787), the court recognized that "it is the duty of a justice of the peace granting a search warrant (in doing which he acts judicially) to limit the search to such particular place or places, as he, from the circumstances, shall judge there is reason to suspect . . . . And the warrant in the present case, being general, to search all places, and arrest all persons, the complainant should suspect, is clearly illegal . . . ." In *Grumon* v. *Raymond,* 1 Conn. 39 (1814), this court held that a justice of the peace lacks jurisdiction to issue an overly general warrant, and may be held liable in trespass to a person who is arrested pursuant to such a warrant. Chief Justice Reeve wrote: "The justice never had any jurisdiction of the subject matter. This purports to be a search-warrant for stolen goods; and the law requires, that before any justice can have power to issue a warrant in such case, certain requisites be complied with. . . . There must be an oath by the applicant that he has had his goods stolen, and strongly suspects that they are concealed in such a place; and the warrant cannot give a direction to search any other place than the particular place pointed out." Id., 45. These cases demonstrate this state's strong commitment to privacy rights and careful scrutiny of warrants even before article first, § 7, was adopted in the constitution of 1818.

The majority relies on the suggestion made in *State v. Barton,* 219 Conn. 529, 538–39 n.4, 594 A.2d 917 (1991), that probable cause was not required for the issuance of a search warrant until after the adoption of the state constitution in 1818.[13] The majority and the *Barton* case are, however, simply wrong.[14] As discussed later, the probable cause requirement for a warrant was embedded in our common law prior to 1818. Therefore, contrary to the claims made in *State v. Barton,* supra, and by the majority, probable cause had attained the status of a constitutional requirement even before the 1818 constitution was adopted.

First, our early case law clearly implies that probable cause was necessary. A person who swore out a

[13] *State v. Barton,* 219 Conn. 529, 594 A.2d 917 (1991), held that the "totality of the circumstances" test of *Illinois v. Gates,* 462 U.S. 213, 103 S. Ct. 2317, 76 L. Ed. 2d 527, reh. denied, 463 U.S. 1237, 104 S. Ct. 33, 77 L. Ed. 2d 1453 (1983), was consistent with our state constitution. In my dissent in *State v. Rodriguez,* 223 Conn. 127, 148, 613 A.2d 211 (1992), I discussed "how the adoption in *State v. Barton,* [supra], of the 'totality of the circumstances' standard of *Illinois v. Gates,* [supra], has undermined the safeguards of the search and seizure clause in our state constitution. . . . Indeed, the right to be secure from unreasonable searches and seizures disappears when the majority superimposes on *Barton* its 'reasonable inference' rule, which amounts to the supplying of vital information by inference to support probable cause in an affidavit where, in fact, the underlying facts upon which the claimed inferences rest are mere shadows in the dark. The combination of these two standards—the totality of the circumstances and the unwarranted inference—spells disaster for the constitutional protection against warrants issued without probable cause." (Citations omitted.) I continue to believe that *Barton* was wrongly decided, and that the principles of *State v. Kimbro,* 197 Conn. 219, 496 A.2d 498 (1985), which were overruled in part by *Barton,* were more consistent with our state constitution.

[14] *State v. Barton,* 219 Conn. 529, 538–39 n.4, 594 A.2d 917 (1991), cites a footnote in an article by Professor Christopher Collier as authority for this proposition. See C. Collier, "The Connecticut Declaration of Rights Before the Constitution of 1818: A Victim of Revolutionary Redefinition," 15 Conn. L. Rev. 87, 93 n.19 (1982). The footnote indicates only that none of the *statutory codes* that preceded the 1818 constitution contained express provisions concerning unreasonable searches. The footnote is silent as to the common law.

warrant could be held liable in trespass if the search produced no yield. See 2 Z. Swift, A System of the Laws of the State of Connecticut (1796) p. 97. A justice of the peace who improperly issued a warrant could also be held liable in trespass. I will discuss this later in more detail.

Second, the common law prior to 1818 clearly required a demonstration that probable cause existed before a search warrant could be issued.[15] Chief Justice Zephaniah Swift,[16] in his treatise on the law of Connecticut, wrote as follows: "But to justify the issuing of [the search warrant], the party complaining must make oath before the justices of the peace granting them, that a theft has been committed, that he suspects, and has probable cause to suspect, that the goods are concealed in such a place, and must shew the reason of his suspicions; the warrant should be directed to a constable or some known public officer: the search should be made in the day time, demand of entrance should be made before the doors are broken open, and it is proper that the party complaining should be present, to identify the goods he has lost. The places or houses to be searched must be mentioned in the warrant, and the name of the party suspected, with a com-

---

[15] I take it from footnote 11 of its opinion that the majority concedes that, prior to 1818, the common law required probable cause for the issuance of a search warrant.

[16] As I discussed in my dissent in State v. Joyner, 225 Conn. 450, 490, 625 A.2d 791 (1993), Justice Swift's writings are particularly important when considering state constitutional issues: "[Justice Swift] was instrumental in encouraging the public and the legislature to convene the constitutional convention of 1818. Although he pursued a written constitution in order to achieve separation of powers, his participation as a leader is significant. J. Trumbull, Historical Notes on the Constitutions of Connecticut and on the Constitutional Convention of 1818 (1873) pp. 40–41. . . . [S]ince Justice Swift was the chief judge and the state's leading judicial scholar at the time of the convention, his views on the law take on great significance in determining what the framers had in mind when adopting the language of the constitution."

mand that the goods found, together with the party in whose custody they are taken, be brought before some justice of the peace, to the end that upon further examination of the fact, the goods and the prisoner may be disposed of as the law directs." 2 Z. Swift, A Digest of the Laws of the State of Connecticut (1823) p. 391 (Digest).[17]

Third, contrary to the suggestion made by the majority in this case and by the court in *State* v. *Barton,* supra, the probable cause requirement reached constitutional magnitude in Connecticut prior to 1818. Although our first formal constitution was not adopted until 1818, we of course were not without a constitution prior to that date. Professor Christopher Collier, the state's historian, explains that "[w]hen eighteenth-century Anglo-American political theorists and prac-

---

[17] Although Justice Swift was writing after the adoption of the Connecticut constitution in 1818, he derived the probable cause requirement from the common law rather than the constitution. This is demonstrated by his citation to "1 Chit. C. L. 64," which is 1 J. Chitty, A Practical Treatise on the Criminal Law (1816) p. 64. On page 64 of the treatise, Chitty commences a discussion of search warrants under the common law. This discussion includes the following passage: "The search warrant is not to be granted without oath (a) made before the justice, of a felony committed, and that the party complaining has probable cause to suspect they are in such a place, and shewing his reasons for such suspicion. (b) The warrant should direct the search to be made in the day-time, (c) though it is said, that where there is more than probable suspicion, the process may be executed in the night. (d) It ought to be directed to a constable, or other public officer, and not to a private person, though it is fit that the party complaining should be present, and assisting, because he will be able to identify the property he has lost. (e) It should also command, that the goods found, together with the party in whose custody they are taken, be brought before some justice of the peace, to the end that, upon further examination of the fact, the goods and the prisoner may be disposed of as the law directs." The language from Justice Swift's Digest of the Laws of the State of Connecticut (1823) p. 391, quoted in the text above tracks this passage almost identically. This clearly establishes that the probable cause requirement was part of Connecticut common law even before the adoption of the constitution in 1818.

titioners spoke of 'the constitution of government,' they used the phrase in its English sense to refer to a whole collection of concepts that included common law, certain significant statutes, various royal proclamations, and even unwritten traditions. Thus was the phrase used in Connecticut. Here it included the Charter of 1662, *certain locally derived common law principles and practices,* some locally applicable English common law, various significant statutes, and most importantly, the Fundamental Orders of 1639." (Emphasis added.) C. Collier, "The Connecticut Declaration of Rights Before the Constitution of 1818: A Victim of Revolutionary Redefinition," 15 Conn. L. Rev. 87, 89–90 (1982).[18] Since the probable cause requirement was part

[18] Other writers have also noted that the common law provided an unwritten constitution for our state prior to 1818. Superior Court Judge Jesse Root wrote in the introduction to his 1789-93 reports of Connecticut cases that "[c]ommon law is the perfection of reason, arising from the nature of God, of man, and of things, and from their relations, dependencies, and connections: It is universal and extends to all men, and to all combinations of men, in every possible situation; and embraces all cases and questions that can possibly arise; it is in itself perfect, clear and certain; it is immutable, and cannot be changed or altered, without altering the nature and relation of things; it is superior to all other laws and regulations, by it they are corrected and controlled; all positive laws are to be construed by it, and wherein they are opposed to it, they are void." 1 Root (Conn.), Introduction, p. ix. Judge Root also noted that the common law "is the Magna Charta of all our natural and religious rights and liberties, and the only solid basis of our civil constitution and privileges—in short, it supports, pervades and enlightens all the ways of man, to the noblest ends by the happiest means, when and wherever its precepts and instructions are observed and followed—the usages and customs of men and the decisions of the courts of justice serve to declare and illustrate the principles of this law . . . ." Id., pp. x–xi.

Chief Justice Ellen Peters has made similar observations, noting that "[i]n Connecticut constitutional law, it is well established that several rights now denominated as constitutional had well-recognized common law antecedents." E. Peters, "Common Law Antecedents of Constitutional Law in Connecticut," 53 Alb. L. Rev. 259, 261 (1989). Chief Justice Peters has recommended that "we should cast a wider net to discover the variety of ways in which substantive rights were protected in state courts in the early years." Id.

of our common law, it was also part of the informal constitution that governed Connecticut prior to 1818.[19]

After incorrectly suggesting that probable cause was not really required until 1818, the majority leaps illogically to the conclusion that de novo review of the magistrate's determination is not required by our search and seizure clause.[20] Some background is necessary to demonstrate the folly of this conclusion.

Prior to 1961, when the United States Supreme Court made the fourth amendment exclusionary rule applicable to the states through the fourteenth amendment in *Mapp* v. *Ohio,* supra, there simply was no exclusionary rule in Connecticut. Scholars have attributed the seed of the exclusionary rule to the early case of *Frisbie* v. *Butler,* supra, 215 ("the warrant in the present case . . . is clearly illegal; yet, how far this vitiates the proceedings upon the arraignment, may be a question, which is not necessary now to determine," since the defendant's conviction was invalid on other grounds). Subsequent case law makes clear, however, that no such rule was applied. See, e.g., *State* v. *Griswold,* 67 Conn. 290, 306, 34 A. 1046 (1896).[21] There

---

[19] The majority takes me to task for providing a "lengthy recitation of the common law history," claiming that this history is irrelevant. As Professor Collier's article makes clear, however, the common law history is highly relevant when construing state constitutional provisions because the common law itself had attained constitutional status prior to 1818.

[20] This leap is predicated, in part, on the majority's incorrect conclusion that the probable cause requirement was first introduced in the 1818 constitution only as a result of our charter having been patterned after the Mississippi constitution of 1817.

[21] It was not until 1988, in *State* v. *Dukes,* 209 Conn. 98, 547 A.2d 10 (1988), that this court held that the exclusionary rule was applicable to evidence seized in violation of the state constitution. The holding was based largely on modern sociological considerations. Justice Healey wrote: "Constitutional provisions must be interpreted within the context of the times. . . . As one court said: 'We must *interpret* the constitution in accordance with the demands of modern society or it will be in constant danger of becoming atrophied and, in fact, may even lose its original mean-

simply was no remedy on the criminal side of the court; the illegally seized evidence was admitted and the defendants were relegated to civil remedies.

Nevertheless, the civil remedy for the issuance of a warrant for which there was not probable cause is illuminating. It is clear that the parties involved in obtaining, issuing and executing the illegal warrant were liable in an action for damages based on trespass. "If a warrant be granted, which is against law, such as no magistrate or justice of the peace should issue, the magistrate granting it, the officer executing it, and the party obtaining it, are liable in an action of trespass." 1 Z. Swift, Digest, supra, p. 495; see also *Grumon* v. *Raymond,* supra; *Frisbie* v. *Butler,* supra. Neither Justice Swift's writings nor these common law trespass cases give any indication that deference was given to the determination of the issuing magistrate, who was usually a defendant in the case, that the warrant was valid. In fact, *Grumon* v. *Raymond,* supra, indicates that the opposite was true. Under the common law, a justice of the peace had no jurisdiction to issue an invalid warrant. Id., 47. In *Grumon*, this court held that, in reviewing the validity of a warrant, "[n]o intendments are made in favor of the jurisdiction of the inferior Courts, or of officers proceeding summarily under a special Statutory authority, but every mate-

ing.' (Emphasis in original.) . . . . It is this court's duty to assure that our constitution does not become 'a magnificent structure . . . to look at, but totally unfit for use.' . . . Moreover, a constitution is, in Chief Justice John Marshall's words, 'intended to endure for ages to come, and, consequently, to be adapted to the various *crises* of human affairs.' (Emphasis in original.) . . . . One court put it this way: 'In short, the [Washington] constitution was not intended to be a static document incapable of coping with changing times. It was meant to be, and is, a living document with current effectiveness.' . . . We agree. The Connecticut constitution is an instrument of progress, it is intended to stand for a great length of time and should not be interpreted too narrowly or too literally so that it fails to have contemporary effectiveness for all of our citizens." (Citations omitted.) Id., 114–15.

rial fact, necessary to confer jurisdiction on such Court or Officer, must be distinctly averred and proved. . . . [T]he party who invokes the exercise of the jurisdiction of an inferior tribunal, must, in justifying, aver the actual existence of the material facts upon which the jurisdiction depends." (Internal quotation marks omitted.) Id., 47 n.1.[22] This passage indicates that the reviewing court was not permitted to defer to the issuing magistrate's belief—whether reasonable or not—that he could validly issue a warrant. Therefore, de novo review was required.[23]

Furthermore, the reasoning in *State* v. *Marsala,* supra, leads me to conclude that de novo review by the trial court is required. In *Marsala,* this court recognized that "the good faith exception would encourage some police officers to expend less effort in establishing the necessary probable cause to search and more effort in locating a judge who might be less exacting than some others when ruling on whether an affidavit has established the requisite level of probable cause. [In addition, it would tell] magistrates that they need not take much care in reviewing warrant applications, since their mistakes will from now on have virtually no consequence . . . ." (Internal quotation marks omitted.) *State* v. *Marsala,* supra, 169.[24] Although the adoption

[22] The majority claims that this rule from *Grumon* v. *Raymond,* 1 Conn. 39 (1814), was limited to situations where a general warrant was issued. This, however, does not make sense because a general warrant was invalid on its face.

[23] Even if there was no affirmative evidence that de novo review was required, in the absence of evidence to the contrary, it would have to be presumed that a plaintiff seeking damages for the execution of an illegal warrant merely had to prove that the warrant was defective, not that the magistrate acted unreasonably. See Z. Swift, Digest of the Law of Evidence (1810) p. 152.

[24] I am also concerned with the majority's suggestion that if one picks up the gauntlet on an issue such as de novo review that tips the scales in favor of privacy, this necessarily means that one is accusing our trial judges of rubber stamping the actions of the police when they issue search war-

of a "good faith" exception would cause more serious injury to rights protected by our constitution than adoption of a deferential standard of review, deferential review necessarily waters down the protection afforded by our state constitution. The police will continue to seek out those magistrates who are not as exacting as others in making probable cause determinations, because the trial court will have to hypothesize inferences that support the warrant even though these inferences may never have entered the mind of the magistrate.[25]

Like their common law antecedents, the modern cases such as *State* v. *Marsala,* supra, and *State* v. *Dukes,* supra, demonstrate a strong judicial commitment to privacy rights and to the idea that law enforcement personnel must be given strong incentives to ensure that the searches they conduct are lawful. The exclusionary rule has replaced the common law action of trespass as the primary deterrent to unlawful searches. Though the mechanism has thus changed, the core idea remains that unconstitutional searches must be deterred. This is further underscored by a case we

rants. No one is suggesting that. Our trial judges are the fountainhead of our democracy. They rank among the best in the country. What I am suggesting is that we all make mistakes, just like Justice David Shea pointed out for the unanimous, en banc court in *State* v. *Marsala,* 216 Conn. 150, 579 A.2d 58 (1990). Indeed, even this court makes mistakes. If our trial judges were always correct (correct as seen through the lens of a majority of this court), there would be no need for appellate review. More importantly, the determination of probable cause under the de novo review procedures would result in the creation of a record which, if necessary, we could review in making our determination.

[25] Footnote 17 of the majority opinion suggests that even if a magistrate's issuance of a warrant is based on a confusion of the facts in an affidavit or other mistake, this is constitutionally irrelevant so long as a reasonable inference could have saved the warrant. I disagree. If the magistrate never draws a necessary inference, but nevertheless issues a warrant based on a mistake of fact, then there can be no probable cause even if drawing the necessary inference would have been reasonable.

decided just last year, *State* v. *Geisler,* supra. In *Geisler,* the defendant moved to suppress evidence seized in connection with a warrantless entry of his home. Id., 675. We held that while we should give deference to factual findings made by a trial court following an adversarial hearing on a motion to suppress, the reviewing court should review de novo the conclusions reached by the trial court based on those facts. Id., 693. Furthermore, since the applicability of the exceptions that permit warrantless searches is reviewed de novo, adopting such a review for search warrants will *not* make searches conducted pursuant to a warrant *less attractive* to the police than warrantless searches. On the contrary, as discussed above, because our law contains burdens and presumptions that clearly favor searches conducted pursuant to a warrant over warrantless searches, the "warrant preference" will still be a strong factor even if de novo review is required.

Finally, for all the reasons I stated in the first part of this dissent, I believe a weighing of the costs and benefits of de novo review strongly supports adoption of it. As discussed above, the defendant would still have the burden of proving that the search was illegal. Requiring de novo review would simply give firm recognition to the importance of this state's constitutional right of privacy. Like its federal counterpart, article first, § 7, "marks the right of privacy as one of the unique values of our civilization." *McDonald* v. *United States,* 335 U.S. 451, 453, 69 S. Ct. 191, 93 L. Ed. 153 (1948).

I would reverse the judgment of the Appellate Court and reinstate the trial court's judgment of dismissal. Accordingly, I respectfully dissent.